TIMOTHY AND KATHLEEN COLLINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TIMOTHY COLLINS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Collins v. Commissioner
Docket Nos. 24345-83, 26919-83.
United States Tax Court
T.C. Memo 1987-259; 1987 Tax Ct. Memo LEXIS 259; 53 T.C.M. (CCH) 873; T.C.M. (RIA) 87259; May 21, 1987. Gloria M. Petroni, for the petitioners. Linda J. Wise, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Addition to Tax
Petitioners
Docket No.
Year
Deficiency
Sec. 6651(a)(1) [1]
Timothy Collins
26919-83
1975
$2,720
$272.00
Timothy Collins and
Kathleen Collins
24345-83
1976
15,023
1,502.00
1977
2,576
128.80
*261 After concessions, the issues that we must decide are: (1) Whether West Virginia Coal Holdings and United Development Company were engaged in business for profit; (2) if so, whether West Virginia Coal Holdings and United Development Company are entitled to deduct currently the expenses they claimed; and (3) whether petitioners are liable for the additions to tax provided by section 6651(a)(1) for failing to file timely returns for each of the years at issue. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. When they filed their petitions herein, petitioners Timothy Collins (hereinafter "petitioner") and Kathleen Collins (hereinafter "Kathleen") were residents of Reno, Nevada. Petitioner filed an individual Federal income tax return for 1975 on which he claimed single filing status. Petitioner and Kathleen filed joint Federal income tax returns for 1976 and 1977. [3]
*262 Background
Petitioner graduated from the University of Denver with a Bachelor of Science degree in Business Administration. In the early 1970's, he was the president of Collins Securities Corporation ("Collins Securities"), an investment firm that specialized in natural resource companies. Collins Securities analyzed the companies and supplied reports to banks, insurance companies, and mutual funds in return for commissions. It was also involved in raising capital for mining companies through private placements and public offerings, and in management consulting. Petitioner met Robert A. Hildebrand, a mining engineer, in the late 1950's or early 1960's. Hildebrand founded Polaris Resources, Inc. in 1969. Petitioner assisted Polaris Resources in raising funds for a gold exploration program, and advised it how to market its stock to the public. On June 10, 1975, Polaris Resources retained Collins Securities to sell a coal property located in Clay County, West Virginia. Polaris Resources owned 50 percent of Polaris Coal, Inc., which directly owned the property. [4] Occidental Coal International owned the remaining 50 percent of Polaris Coal. The property consisted of the *263 coal rights to 6,250 acres along with the surface rights to 4,300 of those acres. Although Polaris Coal did not own the surface rights to the entire 6,250 acres, it had the right to extract coal from the entire acreage by any method without paying for surface damage. Hildebrand, on behalf of Polaris Resources, agreed to pay Collins Securities a ten percent commission if Collins Securities could sell the property for $500,000 down, plus the greater of $100,000 per year or $1 per ton of coal mined, until a total of $7,000,000 had been *264 received. Hildebrand represented to petitioner on June 26, 1975 that the property contained 44,000,000 tons of recoverable coal. The coal industry was booming during this time period. A number of factors including high oil prices prompted by the oil embargo, a government policy to convert from oil to coal, and a general consensus that the world was running out of oil, generated a wave of enthusiasm for the coal industry. The enthusiasm resulted in dramatic increases in coal prices, and created a seller's market for coal properties. During the period, buyers acquired mining interests in reliance on whatever data was available, without the benefit of thorough feasibility studies. It was routine practice for large oil companies to tie up substantial blocks of coal properties by obtaining options on them. It was not uncommon for owners of coal properties to negotiate ten percent royalties. Petitioner learned about the property, in connection with his attempts to sell it, by reviewing the geological data that existed regarding the property. The data included a reserve and economic report prepared in March of 1969 by John P. Morgan & Company (the "Morgan Report"), reports of United *265 States Geological Surveys, and data developed by exploratory drilling conducted in 1974 by FMC Corporation. The Morgan Report concluded that there were at least 73,500,000 tons of coal on the property that were recoverable and salable. It analyzed the quality of the coal, and discussed the considerations relevant to preparing the coal for market. It proposed methods of mining the coal, projected the capital necessary to develop the property, estimated the cost of mining the coal, and estimated production levels that might be achieved. FMC Corporation had optioned the property in January 1974 and had caused nine test holes to be drilled from March through September 1974. Although FMC allowed its option to expire, geological data from the nine test holes was available to petitioner. Petitioner learned more about the property during visits to the property with prospective buyers. During his visits he discussed the property with potential buyers and with persons nearby who were involved in the coal business. Petitioner also retained James Gartin, a mining engineer, to evaluate the possibility of developing the property. Gartin visited the property, reviewed the Morgan Report *266 and the data obtained from the nine test holes drilled by FMC Corporation, and recomputed the quantity of the reserves on the property. Although Gartin never produced a written report, he orally advised petitioner how the property could be developed. As a result of his investigations of the property, petitioner became convinced that it had potential for development. By letter dated October 10, 1975, Collins Securities submitted a formal offer to lease the property with an option to buy on behalf of United Mining Corp. ("United Mining"). [5] Petitioner was the president, chairman, chief executive officer, and 50 percent shareholder of United Mining from its incorporation in 1975 through the time of trial. Polaris Coal accepted the offer. United Mining signed a formal lease agreement with an option to purchase (the "Lease/Option Agreement") on behalf of West Virginia Coal Holdings ("WV Coal"), a limited partnership, with Polaris Coal and others on or before December 31, 1975. Royalties were payable *267 to Polaris Coal under the Lease/Option Agreement at the basic rate of four percent of the gross sales price of the coal less brokerage fees. Advance minimum royalty payments of $350,000 each were due on December 31 of 1975, 1976, 1977, and 1978. The advance minimum royalty payments were payable $100,000 in cash and $250,000 by nonrecourse notes bearing five percent annual interest. The notes were payable in annual installments of $20,000 principal plus accrued interest on the installments beginning on December 31, 1979. An additional annual minimum royalty payment of $10,000 was due on July 31 of each year beginning in 1976. The Lease/Option Agreement allowed United Mining to reduce the basic royalty rate from four percent to as low as 3.25 percent by prepaying the advance minimum royalties as follows: Advance Minimum
If
Royalties Due
Paid Before
Royalty Rate
12/31/76, 12/31/77,
12/31/78
12/31/75
3.25%
12/31/76, 12/31/77
12/31/75
3.50%
12/31/76
12/31/75
3.75%
12/31/77, 12/31/78
12/31/76
3.50%
12/31/77
12/31/76
3.75%
12/31/78
12/31/77
3.75%
The Lease/Option Agreement granted United Mining the option to purchase the property for $1,000,000 *268 plus royalties at the rate in effect at the time of purchase on the first 6,000,000 tons of coal mined and sold from the property, and obligated United Mining to pay all real estate taxes imposed on the property. [6] The term of the Lease/Option Agreement was for as long as minimum royalty payments were made as required, up to a maximum of 99 years. *269 United Mining became WV Coal's general partner. The Certificate of Limited Partnership for WV Coal, which was recorded on December 31, 1975, allocated partnership profits 90 percent to the limited partners and 10 percent to the general partner until the limited partners had received distributions from the partnership equal to their capital contributions. The limited partners would thereafter be entitled to receive only one percent of the profits for each $10,000 of capital they had invested. WV Coal offered 70 partnership units at $10,000 each. A private placement memorandum was issued in connection with the offering. [7] The memorandum warned potential investors that "The economic viability of the Partnership depends upon its being able to obtain a substantial royalty from others who will actually conduct the mining operations on the coal properties." It explained the partnership's plans by stating that: It is the present plan of the Partnership to make arrangements with others who will actually conduct the mining operations with the Partnership receiving royalty payments and possibly a percentage of profits. The General Partner plans initially to insulate the Partnership *270 from the economic risks of direct engagement in mining operation by acting only as a lessor and receiving a royalty or lease payment from the actual mining operator. [Emphasis added.] WV Coal raised a total of $150,000 from the sale of partnership units, and used $100,000 of the $150,000 to make the cash minimum royalty payment due December 31, 1975. It paid the $250,000 balance of the $350,000 minimum royalty payment with a $250,000 nonrecourse note. The proceeds of the offering left WV Coal with little operating capital and, in 1976, petitioner began attempting to sublease the property and thinking of ways to raise more money. He knew that WV Coal would forfeit its rights under the Lease/Option Agreement unless it raised the funds necessary to make the minimum royalty payments due on December 31 of 1976, 1977, and 1978. He also knew that the success of WV Coal depended on its ability to find persons who would conduct mining operations on the property and pay it a substantial royalty. To develop additional data and make the property more attractive *271 to potential lessees, petitioner ordered further geological tests and exploratory work to be performed on the property. Petitioner contacted many persons involved in the mining business to let them know that the property was available for lease and to enlist their help in obtaining a lessee. His efforts resulted in a conference on August 19, 1976, with Barrie Morrison, the president of Chancellor Mining Corporation ("Chancellor"). The conference led to an agreement on October 8, 1976, under which WV Coal subleased part of its interest in the property to Chancellor and received a $7,500 down payment. The Lease/Option Agreement was amended on or about October 13, 1976, to provide that Polaris Coal was entitled to receive 50 percent of the advance royalty payments made by Chancellor to the extent needed to pay the $100,000 cash minimum royalty payments due under the Lease/Option Agreement on December 31 of 1976, 1977, and 1978. The Amendment of October 13 allowed WV Coal to elect to substitute $1,000,000 nonrecourse notes for the $250,000 notes due Polaris Coal as minimum royalty payments under the Lease/Option Agreement. The $1,000,000 notes were to bear four percent interest and *272 be payable in annual installments of $33,000 plus accrued interest on each installment commencing December 31, 1979. For each $1,000,000 note WV Coal elected to substitute for the $250,000 notes, the royalty rate would be reduced by one-sixth of one percent, the purchase option price would be reduced by $166,666.66, and the minimum tonnage on which the royalties were required to be paid would be increased by 333,333.33 tons. Petitioner formed another limited partnership, named United Development Company ("Development") on October 27, 1976. [8]United Mining was named Development's general partner. The private placement memorandum for Development warned potential investors that "The economic viability of the Partnership depends upon its being able to obtain a substantial income from others who will actually conduct mining operations on the coal properties, and who would be required to make payments in the form of royalties or rents." It explained Development's plans by *273 stating that: It is the present plan of the Partnership to make arrangements with others who will actually conduct and continue to pursue the mining operations with the Partnership receiving royalty payments. (See "Chancellor Agreement".) The General Partner believes that such a plan will initially insulate the Partnership from the economic risks of direct engagement in mining operations. The Certificate of Limited Partnership for Development allocated partnership profits 90 percent to the limited partners until the limited partners had received from the partnership distributions equal to their capital contributions. The limited partners would thereafter be entitled to only four-tenths of one percent of the profits for each $10,000 of their original capital investment. On October 28, 1976, Development entered into an agreement (the "Joint Control Agreement") with WV Coal under which WV Coal agreed to convey to Development an interest as large as 50 percent in the Lease/Option Agreement in exchange for Development's agreement to use its best efforts to raise $1,000,000, pay the $300,000 of cash minimum royalties due under the Lease/Option Agreement, and deliver the $3,000,000 *274 of nonrecourse notes payable as advance minimum royalties. The exact size of Development's interest in the Lease/Option Agreement was to be determined by the amount of the cash minimum royalties Development paid. Development was to receive a one percent interest in the Lease/Option Agreement, up to a 50 percent maximum interest, for each $6,000 of the cash portion of the minimum royalties it paid before January 1, 1977. Development also agreed to pay the expenses of the partnership offering, and to pay WV Coal 20 percent, but not more than $100,000, of the proceeds of the offering as reimbursement for expenses incurred in connection with the property. Development raised $716,000, including a $1,000 contribution from United Mining. On December 31, 1976, Development made payments to Polaris Coal and WV Coal. Development paid Polaris Coal $300,000 of cash advance royalties, and $3,000,000 of advance royalties in the form of nonrecourse notes. Development paid WV Coal $100,000. Chancellor never mined any coal on the property and allowed its sublease with WV Coal to lapse. The only payment Chancellor had made, its $7,500 down payment, was refunded to it on January 27, 1977. Petitioner, *275 through United Mining, continued his efforts to sublease the property and, on February 11, 1978, entered into an agreement with AGIP Mining Company, Inc. ("AGIP"). [9] The agreement granted AGIP the option to purchase the interest held in the property by WV Coal and Development for $4,200,000 plus AGIP's assumption of the obligations of the partnerships under the Lease/Option Agreement and the $3,250,000 of nonrecourse notes. The term of the option was a maximum of eight months. AGIP agreed to pay $10,000 per month during the term of the option. The option granted AGIP the right to explore and investigate the coal deposits on the property. AGIP employed the John T. Boyd Company ("Boyd") to conduct an exploration program on the property. Boyd completed the exploration program in August 1978 and concluded that there were approximately 65,300,000 tons of coal on the property. [10]
AGIP extended the option on August 30, 1978 from September 15, 1978 until September 30, 1978. It agreed *276 to pay $1,000 per day for the extension. On September 18, 1978 it extended the option until October 30, 1978 and agreed to pay $2,000 per day for the extension. AGIP notified United Mining on October 4, 1978 that it had elected not to exercise the option. After AGIP allowed its option to expire, petitioner continued his efforts to find an operator to sublease the property and mine its coal. He was able to interest Terry Eagle Coal Company ("Terry Eagle"), a joint venture of W. R. Grace, the Hanna Mining Company, and the Liberty Capital Group, in the property in 1980. Negotiations with Terry Eagle culminated in the execution of a sublease and option agreement on December 31, 1981. The agreement required Terry Eagle to make advance royalty payments beginning on December 31, 1981. The advance royalty payments were to be $225,000 per year for the first five years, $275,000 per year for the second five years, and $100,000 per year thereafter. The agreement entitled WV Coal and Development to receive a royalty of at least three percent on the sales price of coal mined by Terry Eagle. [11] In addition, Terry Eagle agreed to pay the taxes on the property. The agreement gave both Terry *277 Eagle and the partnerships the right to exercise the purchase option contained in the Lease/Option Agreement subject to each other's right to elect to jointly exercise the option, and subject to Terry Eagle's sublease. Terry Eagle paid the $225,000 advance royalty due December 31, 1981, in February 1982. [12] Terry Eagle gave formal notice on January 10, 1983 that it would not exercise the option and allowed the sublease to expire. No coal has been mined from the property since the Lease/Option Agreement was entered into on December 31, 1975. Results of Operations
WV Coal reported the following results of operations on its Federal partnership returns (Forms 1065) for the years at issue: 1975
1976
1977
Income
$100,500 Expenses
Royalties
(350,000)
(10,000)
(5,000)
Management Fee
(15,000)
(60,000)
(75,000)
Consultation
(20,000)
(11,986)
(7,846)
Legal & Acctg.
(26,944)
(10,225)
Office Expense
(815)
Travel
(1,306)
(218)
Bank Charges
(6)
(31)
Real Estate Taxes
(2,625)
(2,088)
Machine Rental
(7,000)
Commercial Testing
(2,000)
Drilling
(2,000)
Advertising
(1,435)
Engineering
(2,947)
Licenses & Permits
(321)
Surveying
(1,527)
Contracting
(4,010)
Insurance
(335)
Ordinary Income (Loss)
($385,000)
($28,885)
($106,280)
*278 Development reported the following results of operations on its Federal partnership returns (Forms 1065) for the years at issue: 1976
1977
Income
$ 439 Expenses
Royalties
(3,300,000)
(5,000)
Management Fee
(71,500)
(75,000)
Consulting
(34,900)
(7,847)
Legal & Acctg.
(72,000)
(14,224)
Office Expense
(11,496)
Travel
(1,270)
(217)
Real Estate Taxes
(2,088)
Equipment Rental
(7,737)
Advertising
(450)
Surveying
(1,528)
Contracting
(3,997)
Insurance
(335)
Dues & Subscriptions
(52)
Printing
(675)
Amortization
(3,333)
(3,333)
Ordinary Income (Loss)
($3,503,413)
($113,130)
Petitioners reported and deducted their distributive share of partnership losses on their Federal income tax returns as follows: Distributive
Share From
Year
WV Coal
Development
1975
($34,650)
1976
(2,600)
(44,101)
1977
(9,565)
(1,424)
In his notices of deficiency, respondent made the following adjustments to petitioners' returns: Adjustment to Income
1975
1976
1977
Loss from WV Coal
$34,650
$ 2,600
$ 9,565
Loss from Development
44,101
[13] 1,398
Medical Expenses
329
Previously Agreed Adjustments
4,562
Total Adjustments
$34,650
$46,701
$15,854
*279 Respondent further determined additions to tax under section 6651(a)(1) of ten percent of the additional tax due for 1975 and 1976, and five percent of the additional tax due for 1977. ULTIMATE FINDINGS OF FACT WV Coal and Development were engaged in for profit during the years at issue. The partnerships intended to earn their profit primarily by subleasing the property and receiving royalties. They had no intention of mining coal themselves. OPINION The primary issue for our decision is whether petitioners are entitled to deduct their distributive share of the partnerships' losses. Respondent has advanced a number of alternative grounds on which to disallow all or part of the losses at issue, and we will discuss each in turn. Profit Motive
Respondent's primary basis for disallowing the partnership losses is that the partnerships were not engaged in for profit. Respondent asserts that tax motives rather than trade, business, or profit purposes were *280 predominant. We disagree. The determination of whether an activity is engaged in for profit is one of fact to be resolved on the basis of all the facts and circumstances. Flowers v. Commissioner,80 T.C. 914, 931-932 (1983). A reasonable expectation of profit is not required as long as there is a bona fide objective to realize a profit. Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The courts have used words such as basic, dominant, primary, predominant, and substantial to describe the requisite profit objective. Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). Profit means economic profit, independent of tax savings. Landry v. Commissioner,86 T.C. 1284, 1303 (1986). When partnerships are involved, the profit objective is determined at the partnership level. Finoli v. Commissioner,86 T.C. 697, 721 (1986). In determining partnership intent and as partnerships do not have minds of their own, we have often focused *281 on the actions taken by the promoters and general partners. Surloff v. Commissioner,81 T.C. 210, 233 (1983). As petitioner was the moving force behind the creation and promotion of both WV Coal and Development, and as he was the president, chairman, chief executive officer, and 50 percent shareholder of United Mining -- the general partner of both partnerships -- our attention will focus upon his intent, knowledge, conduct, expertise, and all other factors he relied upon in making decisions for the partnership. Finoli v. Commissioner,supra at 722. See also Brannen v. Commissioner,78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Little significance is accorded the limited partners' intent as they have no control over the partnerships' activities. Landry v. Commissioner,supra at 1303; Brannen v. Commissioner,supra at 505. Petitioner bears the burden of proving the required profit motive. Golanty v. Commissioner,supra at 426; Rule 142(a). *282 The regulations set forth some of the factors that may be helpful in determining whether an activity is engaged in for profit. [14] The factors do not necessarily apply to every case, however, and a careful review of the facts and circumstances of each case remains the primary test. Gefen v. Commissioner,87 T.C. 1471, 1497 (1986); Abramson v. Commissioner,86 T.C. 360, 371 (1986). Based upon the record before us, we conclude that the partnerships were engaged in with the predominant purpose and intention of making a profit. It is important to define at the outset that the activity the partnerships engaged in for profit was the subleasing of the property -- not the active conduct of coal mining. Petitioner initially became involved with the property when he was retained to sell it. What he learned about the property while he was attempting to sell it convinced him that it contained valuable coal reserves, and prompted him to raise the capital necessary to lease it. He realized that he did not have sufficient capital or expertise to mine coal himself, but felt that he could *283 profitably sublease the property to others who would mine the coal. He expected the partnerships to receive lease or royalty payments in excess of the payments they were obligated to make under the Lease/Option Agreement. The partnerships were, in effect, intended to be middlemen, holding coal rights and leasing them to others who could mine the coal. The record establishes both that it was reasonably possible that the partnerships could earn a profit, and that petitioner worked hard in an attempt to cause the partnerships to realize a profit. Some of the factors on which our findings were based -- that the partnerships were engaged in for profit -- include petitioner's testimony of his intent, the investigation he performed on the property, the efforts he made to profitably sublease the property, and the financial structure of the partnerships. A discussion of these factors follows. Preparation for an activity by study or by consultation with persons who are expert on the activity indicates a profit motive. [15] Respondent asserts that petitioner lacked sufficient knowledge of the coal *284 industry to evaluate the property, and that he failed to adequately investigate the property. We disagree. Petitioner was aware of the economics of the coal industry through his work with Collins Securities before he became involved with the property. He investigated the property by studying its extensive geological data base. The Morgan Report provided him with important information regarding the property including the amount and quality of recoverable coal on the property, methods of mining the coal, the estimated cost of mining the coal, and potential production levels. Petitioner also visited the property to obtain information about it in specific, and the coal industry in the area in general. The information petitioner obtained from his efforts indicated to him, at least, that the property had potential to be profitably developed. We find unpersuasive respondent's criticisms, raised now more than a decade after the partnerships made their investment in the property, that petitioner did not perform an adequate investigation. [16] Contrary to respondent's position, we conclude that petitioner's investigation into the property indicates a profit motive. *285 The efforts petitioner made to profitably sublease or option the property is further evidence that the partnerships were engaged in for profit. [17] The record documents that petitioner made substantial and continuous efforts to sublease or option the property to yield a profit to the partnerships. He contacted many persons involved in the mining business to let them know that the property was available for lease. His efforts succeeded in obtaining three signed agreements to lease or sell the property. The periods between the time petitioner made his initial contacts with the entities that signed the agreements and the time the agreements were executed indicate the length of the negotiations and the extent of petitioner's efforts as follows: Party
Initial Contact
Agreement
Chancellor
8/19/76
10/8/76
Terry Eagle
[18] Before 12/18/80
12/31/81
The financial structure of *286 the partnerships similarly indicates that they were engaged in with a profit motive. The structure of the partnerships gave petitioner a strong incentive to make them profitable. The partnership agreements entitled United Mining, the general partner of each partnership, to receive the bulk of any profits earned by the partnerships once the limited partners had received a return of their capital. Petitioner, as a 50 percent shareholder of the general partner, stood to benefit from those profits. Respondent asserts that the financial structure of the partnerships indicates that they were formed primarily for tax purposes. Respondent argues that the tax benefits received by the limited partners, which resulted mainly from the partnerships' payment of advance royalties with nonrecourse notes, indicates that the partnerships were not engaged in for profit. We disagree. In our view, the partnerships were structured to yield tax benefits to the limited partners in order to make the partnerships attractive to potential investors. As petitioner testified, he was competing for capital and needed to make the partnerships, which the offering memoranda stressed were high risk ventures, attractive *287 to investors. [19] It is well recognized that business transactions are frequently shaped, at least in part, by tax considerations. Frank Lyon Co. v. United States,435 U.S. 561, 580 (1978). In these circumstances, we consider the fact that tax considerations were taken into account in structuring the partnerships to be inadequate grounds, standing alone, for holding that the partnerships were not engaged in for profit. See Frank Lyon Co. v. United States,supra at 580; Helvering v. Gregory,69 F.2d 809, 810 (2d Cir. 1934), affd. 293 U.S. 465 (1935). *288 Finally, we reject respondent's assertion that the history of losses realized by the partnerships indicates that they were not engaged in for profit. Although a history of losses with respect to an activity can be an indication that the activity was not engaged in for profit, [20] we do not consider it to so indicate in the circumstances of this case. We consider it significant that the partnerships have optioned the property three separate times. At least one of the options, the option with AGIP, was on terms that would have yielded the partnerships a substantial profit. In our view, the difficulty the partnerships have had in successfully subleasing the property can be partially explained by the fact that they entered into the Lease/Option Agreement near what, in retrospect, was the end of a boom in the coal industry. In these particular circumstances, to hold that the partnerships were not engaged in for profit due to their history of losses would in effect impose a second penalty on the partnerships, which are already suffering from their poor market timing. In sum, petitioner's testimony that he intended *289 for the partnerships to earn a profit was credible in view of the objective evidence contained in the record. We therefore hold that the partnerships were engaged in for profit during the years at issue. Specific Expenses
Having concluded that the partnerships were engaged in for profit, we must next address respondent's arguments that the deduction of specific partnership expenses should be disallowed. (a) Advance Royalties
Respondent asserts that neither partnership is entitled to deduct advance royalties during the years at issue as neither partnership intended to mine coal. Coal lessees who intend only to sublease their rights and receive royalties from their sublessees, rather than engage directly in mining operations, are not entitled to deduct royalty payments from all ordinary income. They are entitled to deduct their royalty payments only from the royalty income they receive. Davis v. Commissioner,74 T.C. 881, 896 (1980), affd. 746 F.2d 357 (6th Cir. 1984). The rationale behind this rule is that the net royalty income they receive *290 is entitled to capital gain treatment under section 631. Davis v. Commissioner,supra at 74 T.C. 892. Congress could not have intended to permit coal sublessors to report royalties received as capital gain while permitting them to deduct from ordinary income royalties paid. Davis v. Commissioner,supra at 74 T.C. 897. The issue of whether a coal lessee who has not engaged in mining operations intends to be a sublessor is a question of fact. Brown v. United States,782 F.2d 559, 564 (6th Cir. 1986); Davis v. Commissioner,supra at 746 F.2d 363. A lessee is treated as a sublessor from the time it obtains a coal lease if it intended at that time to be a sublessor. Davis v. Commissioner,supra at 746 F.2d 363. [21]
*291 In this case we have found as a fact that the partnerships intended from their inceptions to act as sublessors. Some of the factors that our finding was based on include the representations of intent made in the partnerships' offering memoranda, the lease agreements with Chancellor, and petitioner's admissions at trial. The private placement memorandum for WV Coal stated that "The economic viability of the Partnership depends upon its being able to obtain a substantial royalty from others who will actually conduct the mining operations on the coal properties." The memorandum explained the partnerships' intent by stating that: It is the present plan of the partnership to make arrangements with others who will actually conduct the mining operations with the Partnership receiving royalty payments and possibly a percentage of profits. The General Partner plans initially to insulate the Partnership from the economic risks of direct engagement in mining operations by acting only as a lessor and receiving a royalty or lease payment from the actual mining operator. [Emphasis added.] The execution of the sublease agreement with Chancellor on October 8, 1976, further demonstrates *292 the intent to sublease expressed in WV Coal's offering memorandum. The offering memorandum of Development, issued after the sublease agreement with Chancellor was executed, contained statements of intent to sublease that were nearly identical to those contained in WV Coal's offering memorandum. The memorandum referred to the sublease with Chancellor as an example of the type of sublease Development planned to execute. In addition to the evidence of the partnerships' intent to sublease provided by their offering memoranda and the Chancellor agreement, petitioner's testimony at trial provided additional evidence of intent to sublease. Petitioner admitted on direct examination that his primary intent was to sublease the property. [22]
Petitioners argue *293 that the partnerships are entitled to deduct the advance royalty payments because they attempted to sell their rights in addition to attempting to sublease the property. The fact that the partnerships were willing to sell their rights to the property, evidenced by their agreement with AGIP, does not change our decision that their predominant intention was to sublease. [23] We accordingly hold that the partnerships were not entitled to deduct the royalty payments they made during the years at issue. [24]
As we have upheld respondent's determination that the partnerships are not entitled to deduct the advance royalties they paid during the years at issue, on the grounds that the partnerships intended to act as sublessors, *294 we need not address respondent's alternate grounds for disallowing the deduction of the advance royalties. (b) Other Expenses
Respondent asserts on brief that the partnerships are not entitled to deduct the other expenses claimed on their returns because they "failed to introduce any evidence on the expenses." As our analysis of this issue for 1975 is different from 1976 and 1977, we will discuss 1975 separately. 1975 - In his notice of deficiency for 1975, respondent disallowed the amount claimed by petitioner as his distributive share of WV Coal's loss on the grounds that WV Coal had not "demonstrated that its losses were the result of activities entered into for profit or haveing [sic] any economic substance." In his trial memorandum filed at trial, respondent for the first time argued that WV Coal is not entitled to deduct the other expenses claimed on its 1975 return because the expenses constitute capital expenses. This Court has held on numerous occasions that it will not consider issues that have not been pleaded. See, e.g., Markwardt v. Commissioner,64 T.C. 989, 997 (1975); *295 Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975); Estate of Horvath v. Commissioner,59 T.C. 551, 556 (1973). Whether an issue has been properly raised depends on whether the opposing party has been given fair notice of the matter in controversy. Rule 31(a). We must determine whether petitioners were prejudiced and disadvantaged when respondent raised the issue of whether WV Coal's 1975 expenses were properly to be capitalized, rather than deducted. We conclude that petitioners were prejudiced and disadvantaged. Up until the day of trial, petitioners were unaware of the need to present evidence that the deductibility of WV Coal's 1975 expenses had to be substantiated on any other ground except that WV Coal was legitimately engaged in business for profit. There was no determination by respondent that the expenses were being disallowed because they had not been paid, or had not been paid for the purpose stated, which would have required petitioner to produce different evidence at trial. Indeed, respondent's new position at trial -- that the expenses should have been capitalized rather than deducted -- includes the implicit recognition *296 that the challenged items were in fact paid, and for the purpose stated. That new position itself would have required petitioner to present different evidence at trial, as to the nature of the expense, to overcome respondent's determination that the items should have been capitalized. Respondent made no attempt to amend his answer to raise the deduction/capitalization question and put petitioners on notice that it was being raised. This was a new issue, not properly pleaded, and we will not consider it. Rule 41(b); Rule 34(b)(4); Markwardt v. Commissioner,supra;Estate of Mandels v. Commissioner,supra;Estate of Horvath v. Commissioner,supra.
1976 and 1977 Returns - In his notice of deficiency for 1976 and 1977, respondent determined that the expenses reported by the partnerships "constitute capital expenditures rather than currently deductible items." Respondent's determination is presumptively correct, and the burden of proving that it is incorrect rests on petitioners. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Respondent did not, however, determine in his notice of *297 deficiency that the expenses had not been paid or had not been paid for the purpose stated. Rather, respondent raised this question for the first time on brief, and thus once again raised a new issue that was not properly pleaded and which we will not consider; see our discussion above herein. Both of the parties devoted the bulk of their briefs to the issues of whether the partnerships were engaged in for profit and were entitled to deduct royalty payments. The arguments contained in the briefs regarding whether the other expenses were properly deductible were conclusory, with no reference to the record or legal authorities that would support the conclusions. The testimony at trial and the exhibits are of little help in allowing us to determine the deductibility of the expenses. We are therefore left to determine on our own the portion of the expenses claimed by the partnerships in 1976 and 1977 that constitute deductible expenses. As petitioners bore the burden of proof on this matter, they must suffer the consequences when the record is inadequate to allow us to determine whether the expenses claimed are properly deductible. We are convinced from the types of expenses the *298 partnerships incurred that some of the expenses are deductible. Where, as here, there is an evident right to a deduction, but there is no showing of the exact amount of the deduction, this Court is responsible for determining the appropriate amount of the deduction, weighing its judgment heavily against the taxpayer who is responsible for the deficiencies in the proof. Durkin v. Commissioner,87 T.C. 1329, 1397 (1986) (interpreting Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930)). To determine which of the expenses are deductible we must analyze the grounds on which the expenses could be deducted, in light of the facts in this record. Partnership organizational and syndication costs are nondeductible expenses that must be capitalized. Egolf v. Commissioner,87 T.C. 34, 41 (1986); secs. 263, 709(a). [25] The largest expenses reported by the partnerships in 1976 and 1977, other than royalties, were management and consulting fees. Each partnership *299 paid annual management fees to their general partner, as well as consulting fees. The fees constitute nondeductible organizational and syndication expenses to the extent they were paid as compensation for organizing the partnerships or for promoting the sale of partnership interests. Sec. 709(a). Each partnership was formed late in a calendar year and had little time in the year of formation to conduct business activities that would require supervision by the general partner. It seems likely that substantially all the management fees they paid in their years of organization were compensation to the general partner for organizing and promoting the sale of the partnerships. The same applies to the consulting fees for those years, to whomever paid. We accordingly hold that none of the management fees or consulting fees paid by Development in 1976 are deductible. [26] Fees paid by the partnerships in the years following their years of organization were likely substantially all for on-going management and consulting services. We therefore hold that the management fees and consulting fees paid by WV Coal in 1976 and 1977, and by Development in 1977, were currently deductible. *300 The partnerships' legal and accounting fees can constitute organizational expenses, syndication expenses, capital expenses, or currently deductible expenses. [27] Petitioners admit on brief that only a portion of the legal fees are deductible but that no evidence is available to substantiate an allocation between deductible and nondeductible portions of the fees. In this case the partnerships, as business entities, undoubtedly incurred some amount of deductible legal and accounting expenses. It seems likely, however, that the bulk of legal and accounting expenses incurred during the year in which each partnership was organized and syndicated were organizational and syndication expenses. [28] As both partnerships were organized late in a calendar year, it is likely that substantially all of the legal and accounting expenses they incurred in their years of organization were nondeductible expenses. It does not follow that the legal and accounting expenses paid by the partnerships in the years following their years of organization and syndication were deductible. It is likely that WV Coal paid bills in the year following its year of organization that related to work performed in the *301 prior year. We conclude that the legal and accounting fees paid by WV Coal and Development in 1976 were substantially all for organizational or syndication services. We conclude that the legal and accounting fees paid by WV Coal and Development in 1977 were for on-going ordinary and necessary business services and are currently deductible. [29]
Each partnership also paid a number of other expenses in the years at issue. None of the additional expenses appear *302 to be organizational or syndication expenses. The additional expenses instead appear to be expenses that are currently deductible either as ordinary and necessary business expenses, mine development expenses, or mine exploration expenses. See secs. 162, 616, 617. We accordingly hold that they are currently deductible by the partnerships in the years at issue. Section 6651(a)(1)
In his statutory notices respondent determined that petitioners were liable for the addition to tax provided by section 6651(a)(1) for failure to file timely returns for each of the years at issue. Petitioners have the burden of proving that respondent's determination is erroneous. BJR Corp. v. Commissioner,67 T.C. 111, 131 (1976); Rule 142(a). The stipulated facts support respondent's determination that petitioners' returns were filed late. Petitioners offered no evidence to show that respondent incorrectly determined that they filed untimely returns or that their failure to file timely returns was due to reasonable cause. We therefore sustain respondent's determination that petitioners are liable for the addition to tax provided by section 6651(a)(1) for each of the years *303 at issue. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Reference herein to "petitioners" refers to Timothy Collins only with respect to 1975, and to both Timothy and Kathleen Collins with respect to 1976 and 1977.↩
3. Petitioner mailed his 1975 return on July 20, 1976, and it was received by respondent on July 21, 1976. Petitioners mailed their 1976 return on May 26, 1977, and it was received by respondent on May 27, 1977. Petitioners' 1977 return was received by respondent on October 26, 1978. Petitioner had received a two month extension of time to file his 1975 return. Petitioners had received an extension through October 15, 1978 to file their 1977 return.↩
4. In 1975, the surface rights to the property were owned by Dalcoal Development Company, Inc., and the coal rights were held by Pleasant Union Company, Inc. Both Dalcoal and Pleasant Union were owned by Eastern Development Corporation, which was apparently a subsidiary of Polaris Coal. Dalcoal, Pleasant Union, and Eastern Development each became part of Polaris Coal on September 17, 1976 when Dalcoal and Eastern Development were merged into Polaris Coal after Pleasant Union had been merged into Eastern Development. For convenience, Polaris Coal will be referred to in this opinion as the owner of the property both before and after the merger.↩
5. United Mining was originally named Mineral Holdings, Inc. For convenience, it will be referred to in this opinion as "United Mining" both before and after its name change.↩
6. An amendment (the "Amendment") to the Lease/Option Agreement was executed on or before December 31, 1975. The Amendment provided the same four percent basic royalty rate as the Lease/Option Agreement, and provided for minimum royalty payments of $100,000 per year beginning in 1975 and continuing each year thereafter. It allowed the minimum royalties due in 1979 and later years to be prepaid in units of $250,000 each with up to four nonrecourse notes bearing interest at five percent per year. The notes were payable in annual installments of $20,000 principal plus accrued interest on each installment beginning on December 31, 1979. The Amendment provided that the basic royalty rate would be reduced by each $250,000 prepayment as follows: Each Prepayment
Rate
Made Before
Reduction
12/31/75
0.2% 12/31/76
0.1% 12/31/77
0.05%
The Amendment was never placed into effect by the parties, who followed the payment terms of the original Lease/Option Agreement.↩
7. The memorandum provided that the proceeds of the partnership offering would be used to pay the costs of the offering.↩
8. Development was named United Mining Coal Development until January 12, 1977. For convenience "Development" will be used in this opinion to refer to the partnership both before and after January 12, 1977.↩
9. AGIP was a subsidiary of the Italian National Oil Company.↩
10. That total included 29,912,000 tons of coal in place above drainage and 35,401,000 tons of coal in place below drainage.↩
11. The agreement provided that the partnerships would receive a three percent royalty, and that they would receive an additional royalty of six percent on auger-mined coal. ↩
12. The payment included $3,114.85 interest from December 31, 1981 and totaled $228,114.85.↩
13. Respondent allowed $26 of petitioners' claimed loss from Development in 1977. That amount corresponds to petitioners' distributive share of the $2,088 of taxes that Development reported it paid in 1977.↩
14. See sec. 1.183-2(b), Income Tax Regs.↩
15. Sec. 1.183-2(b)(2), Income Tax Regs.↩
16. Expert witnesses testified on behalf of both petitioners and respondent. Respondent's experts testified to the effect that petitioner inadequately investigated the property, paid too much for the property, and overestimated the royalties that the partnerships would receive from the property. That testimony was rebutted by the testimony of petitioners' witness. In our opinion, all that the expert testimony established conclusively was that there is some amount of mineable coal on the property. We find the testimony to be inconclusive in resolving the issue of whether the partnerships were engaged in for profit.↩
17. Sec. 1.183-2(b)(3), Income Tax Regs.↩
18. Correspondence dated 12/18/80 from the Hanna Mining Company indicates that negotiations began well before that date as it apologized for "considerable delay in responding to a previous contact."↩
19. As we have discussed, supra,↩ the motives of the limited partners for investing in the partnerships have little significance as limited partners have no control over partnership activities. In this case it is not at all clear that tax motives, rather than profit motives, were the primary reason that the limited partners invested in the partnership. We note that United Mining represented that a majority of the limited partners had agreed to allow the partnerships to grant an option to AGIP in 1978 that entitled AGIP to purchase the property on terms that would have yielded a substantial profit to the limited partners.
20. Sec. 1.183-2(b)(6), Income Tax Regs.↩
21. Such treatment makes sense. If lessees who intend to sublease their coal are allowed to deduct their advance royalty payments from ordinary income before they begin subleasing their coal, they could simply pay all of their royalties in advance of subleasing the coal. All of their royalty payments would then be deductible from ordinary income, and all of their royalty receipts would be taxed at capital gain rates.↩
22. When questioned regarding the negotiations leading to the execution of the Lease/Option Agreement petitioner responded: A. Yes, the royalty -- we got the royalty down a little bit. We were trying -- I was trying to get the royalty as low as I could because we were -- our plan involved possibly either selling the property, but more importantly, maybe subleasing it to someone,↩ to another company. [Emphasis added.]
23. We are not required to address here whether the partnerships would be entitled to deduct their royalty payments had their predominant intent been to sell their rights. ↩
24. Our holding does not deny petitioners all tax credit for the advance royalty payments. The advance royalty payments are includable in petitioners' adjusted depletion basis of the coal under sec. 631(c). Davis v. Commissioner,746 F.2d 357, 363↩ (6th Cir. 1984).
25. For years beginning after December 31, 1976, partnerships may elect to amortize organizational expenses over a period of not less than 60 months. Sec. 709(b). Syndication costs may not be amortized. Estate of Thomas v. Commissioner,84 T.C. 412, 442 (1985). As petitioners do not contend that an election to amortize organizational expenses was properly made by the partnerships, no amortization of partnership organization expenses is allowable under sec. 709(b) for 1977. See Egolf v. Commissioner,87 T.C. 34, 46-47↩ (1986). 26. Our decision to refuse to address the issue of whether the management and consulting expenses incurred by WV Coal in 1975 constitute capital expenses, rather than expenses deductible currently, results in the allowance of WV Coal's claimed deduction for management and consulting fees paid in its year of organization. That result is superficially inconsistent with our decision to disallow the deductions claimed by Development for management and consulting fees paid during its year of organization. The superficial inconsistency is due solely to respondent's failure to raise properly the issue of whether WV Coal's 1975 expenses are capital expenses. Respondent raised that issue properly with respect to 1976 and 1977, but failed to raise it properly with respect to 1975.↩
27. Sec. 1.709-2, Income Tax Regs. (legal fees can constitute organizational or syndication expenses); Reed v. Commissioner,55 T.C. 32, 37↩ (1970) (fees can constitute either currently deductible or capital expenses). 28. The offering memoranda of both partnerships provided that partnership funds would be used to pay the expenses of the offerings.↩
29. Compare this rationale for allocating professional fees under the Cohan rule between deductible and nondeductible expenses with the similar rationale applied in Durkin v. Commissioner,87 T.C. 1329, 1397↩ (1986).