**Clyde BROWN, Jr., Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 87–6333.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 29, 1988.

Decided Feb. 27, 1989.

Jesse T. Mountjoy, Timothy O. Shelburne (argued), Holbrook, Wible, Sullivan & Helmers, P.S.C., Owensboro, Ky., for plaintiff-appellant.

Joseph Whittle, David Gray, U.S. Atty.'s Office, Suzanne M. Warner, Louisville, Ky., Gary R. Allen, Appellate Section, Tax Div., Dept. of Justice, William S. Rose, Jr., Gilbert S. Rothenberg, Francis M. Allegra (ar-

gued), Michael J. Salem, U.S. Dept. of Justice, Tax Div., Washington, D.C., for U.S.

Before: KEITH and KRUPANSKY, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Clyde Brown, Jr. appeals from the district court's judgment entered December 1, 1987, which denies in part his claim for a refund of taxes paid filed pursuant to 28 U.S.C. § 1346(a)(1). For the following reasons, we affirm the district court's judgment in part, vacate the district court's judgment in part, reverse the district court's judgment in part, and remand this case for further proceedings.

### I.

Appellant Clyde Brown, Jr. began mining and investing in coal in the early 1950's. He had conducted coal extraction activities in his own name as a proprietor in the 1950's and as late as 1966, but not thereafter. Nonetheless, he is an experienced coal operator with great knowledge of the coal propensities of the counties in western Kentucky.

During the years 1970–1977, Brown entered into the following six different coal mining leases, collection of leases, or subleases in his individual capacity or in cooperation with Brown Badgett, Inc., a corporation in which Brown holds a substantial interest. First, on June 10, 1970, Brown and Brown Badgett acquired as lessees a coal mining lease from Harrison and Pearl Cross (the Cross lease). Second, beginning on November 4, 1970, Brown acquired as lessee six lignite mining leases from Jackson Lignite Company, covering lignite deposits in Alabama, and acquired four leases from other individuals relating to these deposits (the Alabama lignite leases). Third, on October 7, 1973, Brown acquired as lessee a coal mining lease from Hayward Spinks, Jackie R. Spinks, and others (the Spinks lease). Fourth, on July 30, 1976, Brown and Brown Badgett acquired as lessees a coal mining lease from Henry Casebier and his wife (the Casebier lease). Fifth, on October 26, 1976, Brown and Brown Badgett acquired as lessees a coal mining lease from E.R. Wickliffe and his wife (the Wickliffe lease). Finally, on March 8, 1977, Brown entered into a coal mining sublease with Old Ben Coal Company (the Old Ben sublease).[1]

In each transaction, Brown acquired the mineral rights to particular tracts of land in exchange for a certain sum of money per month in advanced minimum coal royalties. These royalty payments were to be credited against future earned royalties.

This tax dispute arises out of Brown's treatment of the advanced minimum royalty payments made to his lessors in 1976. In that year, Brown deducted these payments, totalling $41,118.63, as trade or business expenses pursuant to I.R.C. § 162(a)(3).[2] Section 162(a)(3) permits a taxpayer to deduct "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of trade or business, of property to which the taxpayer has not taken or is not taking title in or in which he has no equity."

After 1976, but before he had begun mining the tracts of land, Brown assigned or subleased each of the coal mining leases to various parties. The Commissioner of Internal Revenue audited Brown's return and assessed a deficiency of $57,397.86 plus statutory interest. Among other things, the Commissioner claimed that the proper treatment of Brown's 1976 advanced minimum royalty payments is gov-

---

1. On June 18, 1976, Brown executed a nine-month option to acquire the Old Ben sublease and paid to Old Ben Coal Company $10,000 as required by the option agreement. On February 26, 1977, Brown notified Old Ben Coal Company of his intention to exercise the option.

2. Following is a breakdown of the payments deducted by each lease:

| LEASE | PAYMENTS DEDUCTED |
|---|---|
| Cross | $ 3,000.00 |
| Alabama lignite | 7,818.63 |
| Spinks | 12,000.00 |
| Casebier | 800.00 |
| Wickliffe | 7,500.00 |
| Old Ben | 10,000.00 |
| TOTAL | $41,118.63 |

erned by I.R.C. § 631(c). Section 631(c) and related provisions require a taxpayer "who owns an economic interest in coal or iron ore in place, including a sublessor" to use such royalty payments to reduce I.R.C. § 1231 gains, and then to deduct a loss under I.R.C. § 165(a). *See* I.R.C. § 272.

Brown paid the assessed income tax deficiency. He then filed timely claim for refund for the year 1976 in the amount of $26,624.31. The Commissioner disallowed Brown's claim for a refund.

Thereafter, on March 25, 1982, Brown filed a complaint in the United States District Court for the Western District of Kentucky for recovery of taxes and interest. In *Brown v. United States,* 600 F.Supp. 47 (W.D.Ky.1984), *rev'd,* 782 F.2d 559 (6th Cir. 1986) (*Brown I*), the district court granted the government's motion for summary judgment, holding that advanced minimum royalties paid by a sublessor cannot be deducted as a trade or business expense pursuant to section 162 even though the sublease arose in years after those royalties were paid. The court further held that section 631(c) mandates that these royalties must be taken into account in computing net royalty income.

This court vacated the district court's judgment in *Brown I,* relying on *Davis v. Commissioner,* 746 F.2d 357 (6th Cir.1984), a case decided by the Sixth Circuit subsequent to the district court's decision in *Brown I. Davis* approved the application of the step transaction doctrine to treat the acquisition of leases and subsequent execution of subleases as one transaction in certain instances, depending upon the taxpayer's intent at the outset. This court remanded the case for further proceedings, holding that a genuine question of material fact remained concerning whether Brown intended to mine the coal as a lessee under the original leases or whether he always intended to become a sublessor. *Brown I* elaborated on the importance of the step transaction doctrine to its holding as follows:

Application of the step transaction doctrine is necessary to a holding that § 631(c) governs the tax treatment of the royalties paid by Brown as a lessee. If the step transaction doctrine applies, Brown will be considered a lessee who is also a sublessor and, pursuant to Treas. Reg. § 1.631–3(b)(3)(ii)(a), he will be subject to the terms of § 631(c) requiring the royalties paid to be offset against royalty income to compute capital gain. If the doctrine does not apply, the execution of the leases and subsequent execution of subleases should be viewed as separate transactions for the purposes of taxation. Under this view, Brown's original treatment of his royalty payments as deductible business expenses would be allowable, since § 631(c) by its own terms does not apply to a taxpayer who is solely a lessee.

*Brown I,* 782 F.2d at 564.

After remand, the district court made the following relevant conclusions of law:

The advanced royalty payments made by the plaintiff for the Wickliffe, Casebier, Cross and Spinks leases during 1976 must be offset by the royalty payments received thereafter with respect to each property, inasmuch as the royalty payments received constituted component parts of overall plans to sublease those properties.

... The advanced royalty payments made by the plaintiff for the Old Ben and Alabama Lignite leases were properly claimed as deductions by the plaintiff on his 1976 federal income tax return inasmuch as he had no settled intention which would constitute plans to sublease those properties.

... The payment by the plaintiff of $10,000.00 for the Old Ben Option Agreement on June 18, 1976, was payment for the purchase of an option which may not be treated as an ordinary business expense under 26 U.S.C. § 162 during the calendar year 1976.

*Brown v. United States,* 687 F.Supp. 288, 293 (W.D.Ky.1987) (*Brown II*).

Brown appealed and the government cross-appealed from the district court's judgment. In accordance with the stipulation of the parties, this court dismissed the government's cross-appeal in an order filed

June 16, 1988. Brown's appeal presents the following issues: (1) whether the district court erroneously applied the step transaction doctrine to the 1976 advanced royalty payments which Brown made for the Wickliffe, Casebier, Cross, and Spinks leases; and (2) whether the district court erroneously held that Brown's payment of $10,000 for the Old Ben option agreement may not be treated as an ordinary business expense under section 162 during the calendar year 1976.

## II.

### A.

A business transaction, like the rest of life, has no clearly defined beginning or end, but it is necessary in practice to cut it, usually chronologically, into segments for tax purposes. If the segment is too thin, however, the tax results may be unfair to the taxpayer or to the government, or to both. In viewing a dynamic whole, the courts often say that an integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences.

B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 1.05 (5th ed. 1987).

■ As the Supreme Court has recognized, "[a] transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consumation ..., is relevant.... To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945).

"The step transaction doctrine is a ' "judicial device expressing the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling." ' " *Brown v. United States*, 782 F.2d 559, 563 (6th Cir.1986) (*Brown I*). *See also McDonald's Restaurants v. Commissioner*, 688 F.2d

520, 524 (7th Cir.1982) (stating that "[t]he step-transaction doctrine is a particular manifestation of the more general tax law principle that purely formal distinctions cannot obscure the substance of a transaction").

The problem of deciding whether to accord the separate steps of a complex transaction independent significance, or to treat them as related steps in a unified transaction is a recurring problem in the field of tax law. The principle that even extended business transactions have determinate limits for tax purposes is based on a strong preference for 'closed transactions' upon which to impose tax consequences. This preference is tempered, however, with respect for the integrity of an entire transaction. Accordingly, the essence of the step transaction doctrine is that an 'integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences'. The mere recitation of the doctrine, however, does not clarify the necessary relationship between the steps requisite to characterization as an integrated transaction.

*King Enters., Inc. v. United States*, 418 F.2d 511, 516, 189 Ct.Cl. 466 (1969) (footnote and citations omitted).

"Although 'there is no universal test applicable to step transaction situations,' the courts and commentators have articulated several tests to be used in determining when the [step transaction] doctrine applies." *Brown I*, 782 F.2d at 563. These tests include the end result test, the interdependence test, and the binding commitment test.

In *Davis v. Commissioner*, 746 F.2d 357 (6th Cir.1984), this court adopted the end result test of the step transaction doctrine in a situation similar to that presented in the instant case. *Brown I*, 782 F.2d at 564. *Cf. Russell v. Commissioner*, 832 F.2d 349 (6th Cir.1987) (adopting the end result test of the step transaction doctrine in a reorganization context). Under the end result test of the step transaction doctrine, " 'purportedly separate transactions will be amal-

gamated into a single transaction when it appears that they were really component parts of a single transaction *intended from the outset* to be taken for the purpose of reaching the ultimate result.'" *King Enters., Inc.,* 418 F.2d at 516 (quoting Herwitz, *Business Planning* 804 (1966)) (emphasis added). "This test clearly makes intent a necessary element for application of the doctrine." *Brown I,* 782 F.2d at 564.

Brown argues that in order for the step transaction doctrine to apply he must have intended to sublease at the time he entered into the original leases. The government argues that it was sufficient that Brown intended to sublease at the time the advanced royalty payments at issue were made. We agree with Brown that his intention to sublease at the time the advanced royalty payments at issue were made does not trigger application of the step transaction doctrine.

The effect of applying the step transaction doctrine to a case such as this is that the taxpayer's acquisition of leases and subsequent subleases are treated as one transaction. *See Davis,* 746 F.2d at 363. This treatment is allowed only when the two acts were in substance only one transaction. Thus, in *Davis* we held that

> [b]y treating Cumberland's acquisition of leases and subsequent subleases as one transaction, the Tax Court was applying the step transaction doctrine, which requires for income tax purposes that component steps of a single transaction are not to be treated separately, so as to assure that tax consequences turn on the substance of a transaction rather than on its form. On appeal, the taxpayers do not challenge the Tax Court's finding that 'Cumberland never intended to nor did it ever engage in any mining operations' and that 'Cumberland's leases were held only for sublease to Webster Coal.' Therefore, based on the undisputed facts of this case, we agree with the Tax Court that because Cumberland never intended to be other than a sublessor, the advanced royalty payments made by Cumberland before it subleased the mining rights to Webster must also be in-

cluded in adjusted depletion basis under section 631(c).

*Id. Accord Brown I,* 782 F.2d at 563 (framing the issue on remand as "whether Brown intended to mine the coal as a lessee under the original leases or whether he *always intended to become a sublessor* "). Only if Brown always intended to become a sublessor would the government be justified in treating his lease and subsequent sublease as one transaction under the step transaction doctrine.

■ In the instant case, the district court made no finding with respect to any of the four leases involved in this issue on appeal that at the time the original lease was entered into Brown intended to sublease. With respect to the Spinks lease, the district court found that Brown kept the leased property a couple of years, i.e., two or three years, before reaching a decision to sublease. With respect to the Cross lease, the district court found that Brown reached a decision to sublease the property within four or five years after acquiring his leasehold interest. With respect to the Casebier lease, although the district court found that Brown could not remember his intentions at the time he acquired his interest in this property or when he decided to assign the lease, the court made no independent finding concerning Brown's intentions. Likewise, the district court made no finding with respect to Brown's original intentions concerning the Wickliffe lease.

Thus, the facts in the instant case are easily distinguishable from *Davis.* In *Davis,* Joe C. Davis was a partner in Cumberland Land Company, a joint venture involved in the leasing of coal mining rights. The joint venture leased coal mining rights from land owners in Kentucky and then in every instance subleased those rights to Webster Coal Corporation, which was wholly owned by partners in the original joint venture. In every instance, Webster Coal, not the joint venture, mined the coal covered by the leases. *Davis,* 746 F.2d at 359. None of these facts are present in the instant case.

Similarly, in *Collins v. Commissioner*, 53 T.C.M. 873 (CCH 1987), the taxpayer formed and was general partner in two partnerships, West Virginia Coal and United Development Company. The private placement memorandum issued in connection with West Virginia Coal's offering of limited partnership stated: " 'It is the present plan of the Partnership to make arrangements with others who will actually conduct the mining operations with the Partnership receiving royalty payments and possibly a percentage of profits. The General Partner plans initially to insulate the Partnership from the economic risks of direct engagement in mining operations BY ACTING ONLY AS A LESSOR and receiving a royalty or lease payment from the actual mining operator.' " The private placement memorandum issued in connection with United Development Company's offering of limited partnership contained nearly identical statements of intent to sublease. Additionally, the taxpayer admitted on direct examination that his primary intent was to sublease the property. In that case, it was found as a matter of fact that "the partnerships *intended from their inceptions to act as sublessors.*"

The facts in the instant case do not support such a finding with respect to any of the leases at issue. In fact, with respect to the Spinks and Cross leases the district court made contrary findings. Therefore, the district court's application of the step transaction doctrine was in error.

The government argues, however, that Brown is precluded from making the argument that in order for the step transaction doctrine to apply Brown must have intended to sublease at the time he entered into the original leases. The government asserts that, in light of the parties' stipulation of issues, it was sufficient that Brown intended to sublease at the time the advanced royalty payments were made. We reject this argument. "A stipulation of law is not binding upon an appellate court." *Avila v. Immigration & Naturalization Serv.*, 731 F.2d 616, 620 (9th Cir.1984). When a stipulation may affect a number of cases beyond the one under consideration, the court has a duty to make an independent resolution of such issue. *Strauss v. United States*, 516 F.2d 980, 982 (7th Cir. 1975).

Having held that taxpayer's intent for the purposes of the step transaction doctrine must be evaluated at the outset, i.e., the time he entered into the original leases, we note that respondent alludes to no other doctrine which makes intent at the time taxpayer made advanced minimum royalty payments relevant. Nor do we think that he properly could. Particularly in light of the strong preference for closed transactions, *King Enters., Inc.*, 418 F.2d at 516, we believe that taxpayer's original intention was binding until taxpayer subleased his interest in the leases.

For the foregoing reasons, we reverse the district court's judgment as it relates to the advanced royalty payments on the Spinks and Cross leases. We vacate the district court's judgment as it relates to the advanced royalty payments on the Casebier and Wickliffe leases and remand this case for further findings on Brown's intent at the time he entered into these latter two leases.

### B.

■ The district court's finding that Brown's June 18, 1976 payment of $10,000 for an option on the Old Ben sublease was payment for the purchase of an option which may not be treated as an ordinary business expense under I.R.C. § 162 during the calander year 1976, may not be upset unless it is clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' ... 'In applying the clearly erroneous standard to the findings of a [trial] court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*.' If the [trial] court's

account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.*

In the instant case, the transcript reveals that taxpayer explained his reasoning in taking the option on the lease in question as follows:

A. To take and look at it and do whatever I could do with it at the time. I went and looked at the records, and they had some drilling on it, and I'd done some drilling on it; and after the nine months, I had enough time to get into it and figure out if I wanted to go ahead and work with it; and I did.

Q. What were you going to do when— let's go back to June of 1976, what did you intend to do if you went and you had your orders, look at the title on those leases, and they proved to be bad title, what would you—what would you—what did you intend to do then?

A. If the title had been bad, I wouldn't take it.

Q. You would not have executed ...

A. If the title was—if I wasn't getting nothing for my money, I wouldn't.

Under these circumstances, the district court's finding that Brown's January 18, 1976 payment of $10,000 was payment for purpose of an option was not clearly erroneous, and its holding with regard to this payment's tax treatment is not in error.

For the foregoing reasons, the district court's judgment is AFFIRMED in part, VACATED in part, REVERSED in part, and this case is REMANDED for further proceedings.