746 F.2d 357
 53 USLW 2264, 84-2 USTC P 9877
 Joe C. DAVIS, Estate of Rascoe B. Davis, Third National
Bank, Executor and Delta C. Davis,
Petitioners-Appellants, Cross Appellees,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee
(81-1127), Cross Appellant (81-1187).
Joe C. DAVIS, Petitioner-Appellant, Cross Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee
(81-1126), Cross Appellant (81-1187).
 Nos. 81-1126, 81-1127 and 81-1187.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 3, 1983.
Decided Oct. 24, 1984.
 
 William Waller, Lawrence Dortch, Charles A. Trost (argued), Nashville, Tenn., for petitioners-appellants, cross appellees.
 N. Jerold Cohen, Chief Counsel, I.R.S., M. Carr Ferguson, Asst. Atty. Gen., John F. Murray, Michael L. Paup, Richard Farber, James A. Riedy, Gilbert S. Rothenberg (argued), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee, cross appellant.
 Before ENGEL and KEITH, Circuit Judges, and WEICK, Senior Circuit Judge.
 WEICK, Senior Circuit Judge.
 
 
 1
 These consolidated appeals by the taxpayers and the Commissioner of Internal Revenue are from decisions of the United States Tax Court, rendered by a sharply divided court.
 
 
 2
 There are two issues involved. The principal issue is whether section 631(c) of the Internal Revenue Code (Code), 26 U.S.C. Sec. 631(c), which permits a sublessor of coal mining rights to treat the royalties he receives from a sublessee of those rights as capital gains, also permits him, as a taxpayer, to deduct from his ordinary income the royalties paid to the lessor for the coal mining rights in this case. The second issue is whether Diedrich v. Commissioner, 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982), should be applied retroactively to a transaction completed by Joe Davis in 1972.
 
 I.
 A.
 
 3
 The facts are undisputed, having been established by stipulation. While we summarize the facts here, a more thorough statement of the facts may be found in the opinion of the Tax Court in Davis v. Commissioner, 74 T.C. 881 (1980). Joe C. Davis and Rascoe B. Davis were originally partners in Cumberland Land Co. (Cumberland), a joint venture involved in the leasing of coal mining rights. Cumberland leased coal mining rights in Kentucky from land owners, and then subleased those rights to another entity, Webster Coal Corp. (Webster), which actually mined the coal. All of Webster's stock was owned, either directly or indirectly, by partners of Cumberland.
 
 
 4
 When Cumberland leased mining rights, it agreed to pay the lessor a royalty of ten cents for each ton of coal mined under the lease. These payments are called "earned royalties." Furthermore, Cumberland was required to pay a minimum royalty each year, even if no coal was mined. These payments are called "advanced minimum royalties." In any year in which Cumberland did not mine enough coal to cover the advanced minimum royalties, the balance of the minimum royalties paid was treated as a credit against future earned royalties.
 
 
 5
 When Cumberland leased mining rights, it would sometimes sublease the rights to Webster immediately. At other times, it would accumulate several leases, and sublease them together. While waiting to sublease mining rights to Webster, Cumberland paid the advanced minimum royalties required by the lease. Whatever the delay between lease and sublease, Cumberland subleased all of the coal mining rights it acquired and never mined coal itself.
 
 
 6
 Cumberland's royalty payments, therefore, can be separated into three categories: first, earned royalty payments, which Cumberland made on coal which its sublessee, Webster, actually mined; second, advanced minimum royalty payments which Cumberland made after it had subleased the rights to Webster; and third, advanced minimum royalty payments which Cumberland made before it had subleased the rights to Webster.
 
 
 7
 Cumberland received royalties from its sublessee, Webster. Under the subleases, Cumberland received either advanced minimum royalties, or earned royalties on the coal extracted. The earned royalties were 30 cents a ton or 8 1/2 percent of the gross sales price of the coal mined, whichever was greater. Thus, for coal actually mined by Webster, Cumberland was insured a profit of at least 20 cents per ton over the ten cents per ton earned royalty Cumberland was obligated to pay the lessor.
 
 
 8
 Cumberland's partners treated all of the royalties that Cumberland paid as business expenses, deductible from ordinary income under section 162(a) of the Code. At the same time, the partners treated all of the royalties Cumberland received from Webster as capital gains under section 631(c) of the Code.[1] After examining the tax returns of Joe and Rascoe Davis for the years 1967 to 1975, in which the partners deducted from ordinary income the royalties Cumberland paid, the Commissioner disallowed these deductions and declared a deficiency, determining that Treas.Reg. Sec. 1.631-(3)(b)(3)(ii)(a) required total royalties paid, both earned and advanced, to be subtracted from royalties received, with the difference reported as long-term capital gain or loss.[2]
 
 
 9
 The majority of the Tax Court held that earned royalties paid by a sublessor of coal mining rights are not deductible from ordinary income. This holding was based on the court's view that section 631(c) of the Code requires that the sublessor's gain or loss be determined by subtracting the adjusted depletion basis of the coal from the royalties the sublessor receives and that, for a sublessor, "the adjusted depletion basis or cost per unit of coal extracted must be interpreted to include earned royalties paid." 74 T.C. at 896. In addition, the majority concluded that "[t]he language in the statute which provides that the lessee's deductions are not affected by section 631(c) cannot be read as applying to a sublessor," because based on the legislative history, "it is reasonably clear that the sentence excluding 'the lessee' was added when the statute was enacted only to ensure that those not benefiting from section 631(c) would not be adversely affected either." Id. at 897.
 
 
 10
 The Tax Court applied the same analysis to the advanced minimum royalties paid on nonoperating leases that had been subleased to Webster Coal, noting that these payments were made by Cumberland as a sublessor, and therefore could not be deducted from ordinary income because the advanced minimum royalties Cumberland received from Websterwere entitled to capital gain treatment under section 631(c). The Tax Court further held that Cumberland could not deduct from ordinary income advanced minimum royalties it paid on leases before it subleased them to Webster, even though the royalties were paid while Cumberland was only a lessee and not a sublessor. The court treated these royalties as having been paid by a sublessor, because "Cumberland, in every case, subleased to Webster Coal the leases it acquired" and "never intended to nor did it ever engage in any mining operations." Id. at 899, citing, e.g., Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945).
 
 
 11
 We agree with the Tax Court that the Commissioner's application of Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a) to the facts of this case is reasonable and consistent with the statutory scheme, and therefore affirm its judgment as to this first issue.
 
 B.
 
 12
 "[I]t is fundamental ... that as 'contemporaneous constructions by those charged with administration of' the Code, [Treasury] Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.' " Fulman v. United States, 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978) (quoting Bingler v. Johnson, 394 U.S. 741, 749-50, 89 S.Ct. 1439, 1444-45, 22 L.Ed.2d 695 (1969); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948)); accord United States v. Correll, 389 U.S. 299, 306-07, 88 S.Ct. 445, 449-50, 19 L.Ed.2d 537 (1967). According to the taxpayers, section 631(c) clearly allows them as sublessors to treat royalties received as capital gains, and as lessees to deduct royalties paid from ordinary income. Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a), however, generally denies sublessors deductions from ordinary income for royalties paid with respect to coal disposed of under Sec. 631(c) by requiring such royalties to be added to the adjusted depletion basis of such coal, notwithstanding language in section 631(c), supra, that:
 
 
 13
 In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to ... royalties shall be determined without regard to the provisions of this subsection.
 
 
 14
 Because a sublessor by definition is also a lessee, we are faced in section 631(c) with an ambiguous statute. "[T]he issue before us is not how we might resolve the statutory ambiguity in the first instance, but whether there is any reasonable basis for the resolution embodied in the Commissioner's Regulation." Fulman, supra, 434 U.S. at 536, 98 S.Ct. at 846. We agree with the Tax Court that the language in the statute, supra, which provides that the lessee's deductions shall be determined without regard to section 631(c), cannot be read to apply to sublessor. The legislative history cited by the Tax Court, 74 T.C. at 897, makes it clear that Congress included this language to exclude lessees from the operation of section 631(c), and not to provide lessees who are also sublessors and therefore "owners" under the statute with the double benefit of capital gains treatment on royalties received from sublessees but deductions from ordinary income under section 162(a) for royalties paid to the lessors, as is argued by the taxpayers.[3] In effect, the taxpayers argue that Congress simultaneously intended to include and exclude sublessors from the provisions of section 631(c), an intent we are unwilling to find. We think a more reasonable interpretation of the statute is that the language regarding lessees was included to ensure their entitlement to deductions from ordinary income for the very same royalties entitled to gain or loss treatment under 631(c) when received by the sublessors. Furthermore, the legislative history and language of the statute make it clear that the benefit of gain or loss treatment under section 631(c) applies to the income of "owners," including sublessors, who are not involved in the actual mining of the coal disposed of pursuant to section 631(c). Whether the taxpayer is a sublessor not engaged in the actual mining of such coal and therefore an "owner" entitled to the benefits of the statute, rather than a lessee involved in the actual mining of such coal and therefore excluded from the operation of the statute, is a question of fact to be resolved by the trial court.
 
 C.
 
 15
 We also agree with the Tax Court that the requirement of Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a) that the sublessor increase the adjusted depletion basis of coal disposed of under section 631(c) by the royalties paid is reasonable and consistent with the statutory scheme. See, e.g., Fulman, supra.
 
 
 16
 Section 631(c) provides that "the difference between the amount realized from the disposal of such coal ... and the adjusted depletion basis thereof ... shall be considered as though it were gain or loss, as the case may be, on the sale of such [coal]." For the definition of "adjusted depletion basis," Treas.Reg. Sec. 1.631-3(b)(2) refers us to section 612, which provides as follows:
 
 Sec. 612. Basis for cost depletion
 
 17
 Except as otherwise provided in this subchapter, the basis on which depletion is to be allowed in respect to any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain upon the sale or other disposition of such property.
 
 
 18
 Section 1011 provides that the adjusted basis for determining gain or loss from the sale of property shall be the basis determined under section 1012, and section 1012 provides in relevant part as follows: "The basis of property shall be the cost of such property ...."
 
 
 19
 We find by reading Secs. 631(c), 612 and 1012 that Congress intended for adjusted depletion basis to be equal to the cost of the property (plus the deductions disallowed for the taxable year under section 272), and for the difference between the amount realized by the sublessor from the disposal of that property and the cost thereof to be treated as capital gain or loss pursuant to section 1231, as appropriate. This is precisely what Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a) provides for. The taxpayers' argument that the sublessor's depletion basis of coal mined by the sublessee is zero is wholly without merit. Royalties paid by the sublessor upon each ton of coal mined constitute the cost of the coal, regardless of whether such royalties are otherwise deductible from ordinary income. Section 631(c) and the entire statutory scheme clearly provide that the difference between the amount realized and the cost of the coal shall be treated as though it were gain or loss under section 1231. Consistent with section 631(c), Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a) requires that the adjusted depletion basis, that is the cost, of the coal includes royalties paid by the sublessor. Thus, the regulation must be sustained.[4]
 
 D.
 
 20
 Having sustained the validity of the challenged regulation, we must determine whether its provisions were properly applied to the taxpayers by the Commissioner. Regarding earned royalty payments Cumberland made on coal which its sublessee, Webster, actually mined, we agree with the Tax Court, 74 T.C. at 896, and our previous discussion makes it clear, that these payments from the sublessor to the lessor on account of coal mined by the sublessee are the sublessor's costs for the coal subleased, and must be added to adjusted depletion basis for the purposes of section 631(c).
 
 
 21
 We further agree with the Tax Court that the foregoing analysis applies equally to the advanced minimum royalty payments which Cumberland, as a sublessor, made after it had subleased the mining rights to sublessee Webster, but prior to actual mining of the coal. See 74 T.C. at 897. In so concluding, we additionally rely on the fact that in any year in which Cumberland did not mine enough coal to cover the advanced minimum royalty payments, the balance of the advanced payments was treated as a credit against future earned royalties. Thus, the advanced minimum royalties paid by Cumberland after it subleased the mining rights to Webster clearly constitute a cost of the coal subleased, and must be added to the adjusted depletion basis.
 
 
 22
 Finally, we address the advanced minimum royalty payments which Cumberland made before it had subleased the mining rights to Webster. Regarding these payments, the Tax Court found as fact that because "Cumberland, in every case, subleased to Webster Coal the coal leases it acquired ... therefore ... Cumberland acquired leases and paid advanced royalties as a sublessor." 74 T.C. at 899. By treating Cumberland's acquisition of leases and subsequent subleases as one transaction, the Tax Court was applying the step transaction doctrine, which requires for income tax purposes that component steps of a single transaction are not to be treated separately, so as to assure that tax consequences turn on the substance of a transaction rather than on its form. See Court Holding Co., supra, 324 U.S. at 334, 65 S.Ct. at 708; Miller v. Commissioner of Internal Revenue, 103 F.2d 58, 59 (6th Cir.1939); King Enterprises, Inc. v. United States, 418 F.2d 511, 516-17, 189 Ct.Cl. 466 (1969). On appeal, the taxpayers do not challenge the Tax Court's finding that "Cumberland never intended to nor did it ever engage in any mining operations" and that "Cumberland's leases were held only for sublease to Webster Coal." 74 T.C. at 899. Therefore, based on the undisputed facts of this case, we agree with the Tax Court that because Cumberland never intended to be other than a sublessor, the advanced royalty payments made by Cumberland before it subleased the mining rights to Webster must also be included in adjusted depletion basis under section 631(c).
 
 
 23
 In so holding, we necessarily reject the argument in dissent of (now District) Judge Hall that such royalties should be allowed as deductions from ordinary income in the absence of a finding of any contractual obligations on the part of Cumberland to execute subleases with Webster. 74 T.C. at 910. This application of the "binding commitment" test of the step transaction doctrine, see King Enterprises, supra, at 517, would be particularly unresponsive to the facts presented, which show that, in every case, Cumberland intended to act as an "owner" as defined in section 631(c). Cf. Comment, Redding v. Commissioner: Step Transaction Doctrine Applied to Distribution of Stock Warrants in a Section 355 Spin-Off, 35 Tax Law. 257, 267 (1981) (reconcile taxpayer intent with Congressional purpose behind Code provision to determine appropriate application of step transaction doctrine). But cf. McDonald's of Zion, Inc. v. Commissioner of Internal Revenue, 76 T.C. 972, 998 (1981) (Hall, J.) (in absence of commitment, inappropriate to apply step transaction doctrine to determine effect on statutory merger of subsequent shareholder of sale of stock), rev'd, 688 F.2d 520, 527 (7th Cir.1982) (applying step transaction doctrine to determine substance of transaction).
 
 E.
 
 24
 As with the recent Supreme Court decision in Commissioner of Internal Revenue v. Engle, --- U.S. ----, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984), "what we do not decide is as important as what we do decide." Id. at 609. No questions that the taxpayers must include advance royalties from the subleases in their income in the year of receipt. See Engle, supra, at 609-10; Treas.Reg. Sec. 1.631-3(c)(1)(i). And we emphasize that this case does not concern the appropriate tax period in which the advanced minimum royalty payments should be used to offset the amount realized from the disposal of the coal. Cf. Engle, supra, at 610 (allowing percentage depletion deduction against lease bonus or advance royalty income, even though prior to actual production). The Tax Court found that for the purposes of this case, the Commissioner concedes that advanced minimum royalties may be taken into account when paid, and that such royalties may produce ordinary loss if such payments exceed section 1231 gains. 74 T.C. at 895 & n. 17. The issue is a significant one, but none of the parties have raised it on appeal.[5] Furthermore, this is not a case involving the payment of advanced royalties by a lessee who did not intend to but, subsequently in fact, did become a sublessor. Finally, this case does not involve "rents" not properly constituting a cost of the coal extracted. Our decision holds only that section 631(c) requires a sublessor to add royalties paid to adjusted depletion basis in determining gain or loss on the disposal of coal pursuant to that section, and that the Commissioner's Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a) is a reasonable construction of the Code consistent with the statutory scheme.
 
 II.
 
 25
 In 1972, in a separate transaction, Joe C. Davis gave securities to trusts he had established for the benefit of some of his nieces and nephews. At the time Davis made the gift, the securities were valued at $3,546,875, and Davis had a basis in them of $21,670. The gift was conditioned upon the trustee of the trusts paying the gift taxes. The Commissioner claimed that the payment of gift taxes was income to Davis. The Tax Court, however, ruled that the payment was not taxable income. 74 T.C. at 907.
 
 
 26
 In Diedrich v. Commissioner, 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982), the Supreme Court held that when the donee pays gift taxes on a gift, the payment is taxable income to the donor. In response to Diedrich, Congress recently enacted section 1026 of the Deficit Reduction Act of 1984, Pub.L. No. 98-369 (June 29, 1984) (H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 563, U.S.Code Cong. & Admin.News 1984, p. 751), in relevant part as follows:
 
 
 27
 Sec. 1026. NO GAIN RECOGNIZED FROM NET GIFTS MADE BEFORE MARCH 4, 1981.
 
 
 28
 (a) IN GENERAL.--In the case of any transfer of property subject to gift tax made before March 4, 1981, for purposes of subtitle A of the Internal Revenue Code of 1954, gross income of the donor shall not include any amount attributable to the donee's payment of (or agreement to pay) any gift tax imposed with respect to such gift.
 
 
 29
 Section 1026 clearly governs the 1972 transfers by Joe C. Davis. Thus the decision of the Tax Court as to this second issue must be affirmed. See also Turner v. Commissioner, 49 T.C. 356 (1968), aff'd, 410 F.2d 752 (6th Cir.1969).
 
 III.
 
 30
 Accordingly, the decision of the Tax Court as to both issues raised on appeal is AFFIRMED.
 
 
 31
 ENGEL, Circuit Judge, dissenting in part and concurring in part.
 
 
 32
 I respectfully dissent from Part I of Judge Weick's opinion. I would adopt in full as the law of this circuit the rationale expressed in the Tax Court in the dissenting opinion of Judge Goffe, Davis v. Commissioner, 74 T.C. 881, 911 (1980).
 
 
 33
 I agree with Judge Weick that recently enacted section 1026 of the Deficit Reduction Act of 1984 clearly governs the 1972 transfers by Joe C. Davis and compels our affirmance of the Tax Court's ruling in this respect. I therefore concur in Part II of Judge Weick's opinion.
 
 
 
 [1]
 Section 631(c) provides in part for the relevant periods:
 (c) DISPOSAL OF COAL OR DOMESTIC IRON ORE WITH A RETAINED ECONOMIC INTEREST.--In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word "owner" means any person who owns an economic interest in coal or iron ore in place, including a sublessor. The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. * * *
 Section 1231(b)(2) provides:
 (2) TIMBER, COAL, OR DOMESTIC IRON ORE.--Such term ["property used in trade or business" under section 1231] includes timber, coal, and iron ore with respect to which section 631 applies.
 Thus, when read together, Secs. 631(c) and 1231 treat the net royalty income of a sublessor of coal mining rights as capital gain, and the net royalty loss as ordinary loss.
 
 
 [2]
 Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a) provides:
 (ii)(a) However, a lessee who is also a sublessor may dispose of coal and iron ore as an "owner" under section 631(c).... [R]oyalties paid with respect to coal or iron ore disposed of by such a lessee under section 631(c) shall increase the adjusted depletion basis of the coal or iron ore and are not otherwise deductible.
 In the statutory notices of deficiency, the Commissioner determined that Cumberland was required to subtract royalties paid from royalties received and to report its net income as long-term capital gain or loss, but conceded in the Tax Court that section 1231 would allow for ordinary loss from the coal leasing operations. 74 T.C. at 889, 895.
 
 
 [3]
 S.Rept. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 488, 575:
 "It is also made clear that these provisions do not apply to a lessee * * * "
 "For the purpose of clarification, your committee has also expressly provided that, in determining the gross income, the adjusted gross income, or the net income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of section 117(k)(2), as amended by this section."
 
 
 [4]
 The rule of deference to the Commissioner's Regulation is particularly appropriate here, since, while obviously some rule of valuation must be applied, Congress not only failed expressly to provide one, but did specifically provide in section 611 as follows:
 Sec. 611. Allowance of deduction for depletion
 (a) General rule.--... [T]here shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion ... according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate.
 See also Fulman, supra, 434 U.S. at 533, 98 S.Ct. at 845.
 In light of section 611, we must reject the argument in the dissent of Judge Goffe of the Tax Court, 74 T.C. at 914-19, that the adjusted depletion basis in the case of sublessors must be computed in exactly the same manner as for owners in fee of coal interests which include reserves. It is unrealistic to require royalties paid by the sublessor for coal extracted to be apportioned between the adjusted depletion basis of that coal and the adjusted depletion basis of coal not yet extracted; royalties paid for coal extracted could hardly be considered a cost of coal not yet extracted. Section 611 allows the Commissioner to prescribe the allowance for depletion "according to the peculiar conditions in each case," and he has done so for sublessors in Treas.Reg. Sec. 1.631-3(b)(3)(ii)(a). Judge Nims' concurrence, 74 T.C. 907-09, shows that the Regulation is eminently reasonable, and clarifies the error in Judge Goffe's analysis.
 
 
 [5]
 To require the capitalization of advanced minimum royalties paid and to delay their offset against royalties received until the year of extraction would have created additional taxpayer deficiencies. See 74 T.C. at 895, n. 17. Thus, the taxpayers' silence on the timing issue is understandable
 Furthermore, it would be improper for this Court to address that issue in the absence of a "controversy" requiring our resolution. See Engle, supra, 104 S.Ct. at 610; U.S. CONST., art. III, Sec. 2, cl. 1.