PHILIP R. BISHOP AND JULIE W. BISHOP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bishop v. Commissioner
Docket No. 27071-87.
United States Tax Court
T.C. Memo 1989-574; 1989 Tax Ct. Memo LEXIS 573; 58 T.C.M. (CCH) 478; T.C.M. (RIA) 89574; October 25, 1989. Michael D. Kaitcer, for the petitioners. Kenneth L. Bressler, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1983 and 1984 in the amounts of $93,422.40 and $12,730, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision whether amounts received by petitioners under an agreement with North American Coal Corporation (North American) are to be treated under section 636(a) [1] as if they were mortgage loans on the property and therefore not includable in petitioners' income or are to be taxed as long-term capital gain on the disposal of coal under section 631(c). *575 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Fort Worth, Texas at the date of the filing of the petition in this case, filed a joint individual income tax return for each of the calendar years 1983 and 1984. On February 12, 1981, North American as buyer and petitioner Philip R. Bishop, and Dan M. Royall, Jr., as sellers entered into an agreement with respect to a certain coal lease. This agreement provided in part as follows: I. By a certain Assignment of Coal and Lignite Lease of even date herewith, Sellers have assigned to Buyer, subject to this Agreement, that certain Coal and Lignite Lease dated the 12th day of February, 1975, from H.S. DeArman, and wife, Marjorie Crawford DeArman, as Lessors, to B. R. Cullen, as Lessee, which is recorded in Book 749, page 538 of the Deed Records of Henderson County, Texas, to which reference is here made, for all purposes, which lease so assigned to Buyer shall be hereinafter referred to as the "DeArman Lease." This Agreement shall be considered a part of said Assignment to Buyer, from its inception, just as though fully set out therein. II. Sellers *576 have reserved unto themselves, and so reserve hereby, a Production Royalty interest equal to the greater of Fifty Cents ($0.50) per ton, or five percent (5%) of the fair market value, mined and loaded for shipment at the mine mouth, for each ton of 2,000 pounds of coal and lignite which is produced, mined and sold from the land covered by and allocable to the DeArman Lease. * * * III. For the purposes of this Agreement, a "lease year" shall mean a period during the term of the DeArman Lease from February 12 through the following February 11, inclusive. For each lease year of the term of the DeArman Lease (including extensions or continuations of the term), beginning with the lease year which began February 12, 1981 and continuing each lease year through and including the lease year beginning February 12, 2000, Buyer agrees to mine, produce and sell, or to pay Sellers for if not mined, produced and sold, a quantity of coal or lignite covered by the DeArman Lease equal to four hundred twenty-eight thousand five hundred seventy (428,570) tons ("minimum contract tonnage"). Buyer shall pay Sellers for such minimum contract tonnage a Minimum Advance Royalty of Two Hundred Fourteen *577 Thousand Two Hundred Eighty-five Dollars ($214,285.00). The first Minimum Advance Royalty payment shall be due and payable on the date of the closing of this Agreement (which closing shall not be later than five (5) days after the execution of this Agreement by Buyer and Sellers) and a subsequent Minimum Advance Royalty payment in like amount shall be due and payable on or before each February 12 thereafter during the term of the DeArman Lease, through and including February 12, 2000, or until Buyer has reassigned to Sellers all of the interest then remaining in and to the DeArman Lease which was assigned to Buyer by Sellers in accordance with the terms hereof, whichever occurs first. In addition, notwithstanding anything to the contrary contained in this Agreement, if, after all Minimum Advance Royalty payments due hereunder through the lease year ending February 11, 1995 have been made by Buyer, the total recoverable coal and lignite in and under the land covered by the DeArman Lease has been mined and the Production Royalties have been paid thereon by Buyer, and all mining of coal and lignite from such land has permanently ceased (which shall be the end of the life of the mine *578 with respect to the land covered by the DeArman Lease), then Buyer shall not be required thereafter to make any further Minimum Advance Royalty payments, and the DeArman Lease shall remain in effect in accordance with its own terms and provisions, provided that Buyer complies with the terms and provisions thereof. Buyer shall have the right at any time during the time Buyer owns the DeArman Lease to make up any deficiencies of coal or lignite for which Buyer has theretofore paid Minimum Advance Royalties but has not produced, mined and sold, and to receive credit against the Production Royalties due therefor for all then uncredited Minimum Advance Royalties theretofore paid pursuant to this Agreement. All Minimum Advance Royalties paid to Sellers under the provisions of this Agreement shall apply toward and be credited on Production Royalties payable or to become payable on actual production pursuant to the terms of this Agreement (without interest), but Buyer shall still be obligated and required to make the Minimum Advance Royalty payment each lease year as hereinabove provided, even during those lease years in which actual mining operations take place. Buyer shall pay Sellers *579 a Production Royalty for such coal or lignite actually produced, mined and sold from the land covered by the DeArman Lease equal to the greater of Fifty Cents ($0.50) per ton, or five percent (5%) of the fair market value (as herein defined) of such coal or lignite, such fair market value to be determined in each instance at the end of the respective calendar quarters (March 31, June 30, September 30, December 31) in which such particular quantity of coal or lignite is actually produced, mined and sold. The Production Royalties payable on coal and lignite actually produced, mined and sold shall be paid to Sellers no later than the 25th day of the calendar month following the end of the calendar quarter in which such coal and lignite was produced, mined and sold from the land covered by the DeArman Lease. In the event the cumulative amount of Minimum Advance Royalties and/or Production Royalties, or either of them, paid to Sellers hereunder exceeds the amount of total Production Royalties to be paid to Sellers hereunder, Sellers shall be excused from any accounting on such excess royalty payments, and excused from any payment, repayment or reimbursement thereof. The Minimum Advance *580 Royalties and Production Royalties provided for in this Agreement shall not be affected by the pooling provisions or consolidated royalty provisions of paragraph 4 of the DeArman Lease or any other part thereof, nor by any payment provided for therein as royalty or in lieu of royalties, it being the intent of the parties that the Production Royalties due hereunder shall be based on the coal or lignite produced, mined and sold from the land covered by the DeArman Lease, and that no party shall have any interest therein except as herein provided. Buyer shall pay the minimum Advance Royalties and Production Royalties due hereunder, at the time the same become due and payable, in the following manner: A. One-third (1/3) thereof to Philip R. Bishop, at 1500 First National Bank Building, Fort Worth, Texas, or to his heirs, successors or assigns; B. One-third (1/3) thereof to Dan M. Royall, Jr., at Royall Chevrolet Company in Malakoff, Texas, or to his heirs, successors or assigns; C. One-third (1/3) thereof to H. S. DeArman and wife, Marjorie Crawford DeArman, jointly, at the Citizens State Bank in Malakoff, Texas, or to their heirs, successors or assigns. Sellers hereby acknowledge *581 and agree that the payments of such Minimum Advance Royalties and/or Production Royalties to H.S. DeArman and Marjorie Crawford DeArman shall be counted in fulfilling the total royalty payment obligations of Buyer as provided for in this Agreement. Buyer agrees to determine accurately the quantity of all coal and lignite produced, mined and sold from the land covered by the DeArman Lease, and to accurately maintain appropriate records thereof, together with appropriate records for all other information taken into consideration in arriving at the amount of the Production Royalty due to Sellers hereunder. With each payment of royalty made pursuant to this Agreement, Buyer will furnish Sellers a written statement showing the quantity of all coal and lignite produced and sold from the land covered by the DeArman Lease during the past accounting period, and the sales price, as herein defined, received by Buyer for such coal and lignite. * * * IV. Buyer will accept assignment of the DeArman Lease subject to all of the terms and conditions thereof, except that it is specifically understood and agreed by Buyer and Sellers that Buyer shall have no obligation to comply with, and Sellers *582 shall hold Buyer harmless from, the royalty provisions of paragraphs 3, 5 and 8A of the DeArman Lease. Buyer shall comply with all other provisions of the DeArman Lease. Buyer shall not alter, amend, waive, release or modify any part or term of the DeArman Lease, nor release any of the land covered by the DeArman Lease from the terms thereof without the prior written consent of Sellers. V. Buyer agrees that the timely payment of the Production Royalties and/or Minimum Advance Royalties as provided for in this Agreement shall be a condition to the continuation of Buyer's interest in the DeArman Lease, and that Buyer's failure to make any such payment(s), within thirty (30) days after written notice from Sellers of Buyer's default in making such payment(s) when originally due, shall result in the automatic termination of all of Buyer's interest in the DeArman Lease, and Buyer shall reassign the said DeArman Lease to Sellers. Buyer represents that it is Buyer's expectation to mine the land covered by the DeArman Lease for coal and lignite, and agrees that it will use its best efforts, consistent with sound engineering and mining practices, to include all of the acreage covered by *583 the DeArman Lease in all appropriate applications for mining permits * * *. VI. Buyer further agrees that Buyer, at Buyer's sole expense, will comply with, and hold Sellers harmless from, all of the terms, conditions and obligations of the DeArman Lease (other than the royalty provisions set forth in paragraphs 3, 5 and 8A thereof), and that Buyer will comply with all applicable laws, rules and regulations affecting mining operations on the said lands, including those for the protection of the environment, prevention of water pollution and reclamation of mineral land, and will hold Sellers harmless from the liability for same. On February 12, 1975, H.S. DeArman and his wife, Marjorie Crawford DeArman, executed a document with B. R. Cullen. This document which is referred to in the agreement between North American and Mr. Bishop and Mr. Royall as the DeArman lease provided in part as follows: 1. Lessor, in consideration of Ten Dollars ($10.00) and other good and valuable consideration as advance royalty in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements of Lessee herein contained, does hereby grant, demise, lease, and let exclusively *584 unto Lessee, its successors and assigns, the following described lands and all the merchantable, mineable, and stripable coal and lignite and their constituent products and all other mineral substances associated or commingled therewith, herein called "coal," situated and lying or being in, under or upon said lands, together with (1) the right to prospect, explore, develop, mine, and operate for and produce by any method or methods deemed desirable by Lessee (including mining by strip mining, open pit, deep shaft, incline, adit or any other method) said coal; * * *. 2. Subject to the other provisions herein contained, this Lease shall be for a term of twenty (20) years from the effective date hereof (called "Primary Term") and as long thereafter as (a) coal is being produced from the Premises in quantities deemed paying by Lessee, and/or (b) mining operations are being prosecuted on the Premises on a continuous basis and/or (c) this Lease may be maintained in force and effect under any other provisions herein contained. The term "mining operations" as used in this Lease includes the production of coal, operations for opening, reworking, deepening, extending or repairing a mine *585 and all other operations conducted in an effort to obtain or to re-establish the production of coal. Mining operations shall be deemed continuous so long as all such operations do not cease for a period of more than ninety (90) consecutive days. For the further consideration of Ten Dollars ($10.00) in hand paid, receipt of which is hereby acknowledged, Lessee is hereby granted the right and option to extend the Primary Term of this Lease, or any portion thereof then in force, for an additional twenty (20) years from and after the expiration of the initial Primary Term hereof, upon the same terms and conditions as provided herein, which option may be exercised by Lessee paying or tendering to Lessor or the credit of Lessor in the depository bank herein named the sum of THIRTY-FIVE Dollars ($35.00) per acre advance royalty for that portion of the Premises as to which this Lease is to be extended. 3. Lessee shall pay Lessor as royalty One Hundred and Twenty-Five Dollars ($125.00) per acre foot for each acre foot of all merchantable coal mined and removed from said Premises with a prorated portion of such sum being paid on fractions of acre foot units. Such royalties shall be paid *586 quarterly within thirty (30) days from the expiration of the calendar quarter in which the coal is mined and removed from the Premises. Lessee agrees to determine accurately the quantity of all merchantable coal mined and removed from the Premises and to accurately enter the quantity or quantities thereof in appropriate records to be kept and preserved by the Lessee for the purposes of determining the amount of royalty due Lessor hereunder. With each quarterly royalty payment, Lessee will furnish Lessor a written statement showing the quantity of all merchantable coal produced, saved and removed from the Premises during the preceding three months and this statement will be attached to or made a part of the payment to Lessor. * * * 5. Within one (1) year from the effective date of this Lease and on or before each anniversary date thereafter while mining operations are not being prosecuted on the Premises, Lessee agrees to pay or tender to Lessor as an advance royalty for the next ensuing year the sum of One Dollar ($1.00) per acre for each acre of the Premises covered by this Lease at the time payment is made. * * * 6. Lessee may at any time and from time to time execute and *587 deliver to Lessor a release or releases covering all or any part of the Premises and thereupon terminate this Lease as to such lands and Lessee shall thereupon be released from all further obligations and duties as to the lands so released except obligations accrued as of the day of the surrender. All lands so released shall remain subject to the easements and rights of way hereinabove provided for so long as any portion of this Lease is in force. 7. If at the expiration of the Primary Term or extension thereof or at any time or times thereafter while this Lease shall remain in force and effect Lessee has obtained production of coal from the Premises and all such coal production should cease and if there is located under or upon the Premises coal in quantities which in Lessee's opinion may be commercially produced, Lessee may continue to pay or tender to Lessor annually the advance royalty payments as provided in paragraph 5 above and if such payments are made or tendered it will be considered that the coal covered by this Lease is being produced from the Premises in paying quantities; provided, however, that this Lease cannot be extended by reason of such advance royalty payments *588 under this paragraph for a period longer than ten (10) consecutive years. 8. There shall be no obligation on Lessee to begin or prosecute mining operations on the Premises, nor to mine and remove all or any portion of the coal situated thereon, nor shall there by any implied covenant so to do. 8a. *In the event Lessee and/or his Assigns pays to other interest owners under this tract a greater bonus consideration per acre, or royalty as provided for in Para.#3, Lessors herein named shall receive that greater amount, than provided for in this agreement. 9. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns of the parties hereto. * * * 13. Lessor shall not institute an action for cancellation of this Lease because of default made by Lessee in any of the terms, covenants or conditions contained herein unless Lessee has not begun to remedy such default within ninety (90) days after receipt of written notice from Lessor specifying such default and requesting remedying thereof. Petitioners are not shareholders of North American and are not co-adventurers *589 or partners or principals in the mining of coal by North American. Petitioners were cash basis taxpayers during the years 1983 and 1984. There has been no mining of coal or lignite under the agreement of February 12, 1981, between North American as buyer and Mr. Bishop and Mr. Royall as sellers from the inception of the agreement through December 31, 1984. During each of the taxable years 1983 and 1984 petitioners received $71,428 pursuant to the terms of the agreement dated February 12, 1981. Petitioners did not include the $71,428 in their reported income, but did attach to their return for each of the years a statement regarding receipt of advance royalties. The statement for the year 1983 was as follows: During 1983, the taxpayers received $71,428 as a "Minimum Advance Royalty" under a coal and lignite lease dated 2-21-81 with the North American Coal Corporation. Taxpayers are of the opinion that no "taxable" income is realized from this transaction until the ore is mined. During the year 1983 no ore was mined. They attached a statement to their 1984 return which in substance is the same as the statement attached to their 1983 return. Respondent, in his notice of deficiency, *590 determined that the $71,428 which petitioners received in each of the years 1983 and 1984 as a minimum advanced royalty under a coal and lignite lease is taxable income and the income is subject to capital gain treatment. Respondent increased petitioners' reported income in each of the years 1983 and 1984 by $28,571 representing 40 percent of the minimum advanced royalty received. OPINION Petitioners, relying on our holding in Freede v. Commissioner,86 T.C. 340 (1986), revd. 864 F.2d 671 (10th Cir. 1988), contend that the payments they received from North American in each of the years here in issue were for a carved-out production payment from mineral property and, therefore, should be treated in accordance with the provisions of section 636(a) and the regulations thereunder. Relying on the Freede case and section 1.636-1(a)(1)(ii) of the Income Tax Regs., petitioners state that the amounts they received are production payments which should be treated, under section 636(a), as a loan and that such treatment of the advanced payments results in the amounts thereof not being taxable to petitioners in the years here *591 in issue. In Freede v. Commissioner,supra at 345, we pointed out that a production payment is a right to minerals in place entitling its owner to a specified share of production for a limited time from a specified mineral property when production occurs. We also pointed out that a "'carved-out' production payment arises where the owner of an interest in a mineral property assigns a production payment to another person but retains his interest in the property from which the production payment is assigned." Petitioners argue that the facts here meet all the criteria outlined in Freede v. Commissioner,supra, required by the statute and regulations and, therefore, the payments they received should be considered carved-out production payments under section 636(a). In Freede v. Commissioner,supra at 347, we stated: The criteria that must be satisfied under the terms of the statutes and regulations set forth above [section 636(a) and sections 1.636-1(a)(1)(ii) and 1.636-3(a)(1) and (2), Income Tax Regs.] are: (1) the purchaser must have a right to a specified share of production or the proceeds from such production; *592 (2) the interest must have an expected economic life (at the time of its creation) of shorter duration than the economic life of the mineral property upon which it is a burden; (3) the right must be an economic interest in the mineral in place; (4) the interest must not be able to be satisfied by other than the production of mineral from the burdened mineral property; and (5) the production payment must be limited by either a dollar amount, a quantum of mineral, or a period of time. * * * [2]
Petitioners argue that their agreement is comparable to the one in Freede v. Commissioner,supra, which we held met the above criteria of the regulations for a carved-out production payment. *593 We have set forth in some detail the agreement between Mr. Bishop and Mr. Royall and North American as well as the DeArman lease which was assigned to North American. While no facts in the record show how Mr. Bishop and Mr. Royall acquired the DeArman lease, neither party questions the fact that they had the right to assign it, so we assume that in some manner they acquired this lease from Mr. Cullen. In our view, the agreement of February 12, 1981, between North American as buyer, and Mr. Bishop and Mr. Royall as sellers, clearly assigned all petitioners' interest in the DeArman lease to North American in return for royalty payments. While the lease did provide for minimum contract tonnage for a period of 20 years (or a period of 15 years if all coal was mined in that time period), the royalties to be paid were not limited by the minimum required payments. Mr. Bishop and Mr. Royall had a right to royalties on all coal mined and for as long as mining was being carried on by North American. North American had a right to mine as long as the DeArman lease continued. Under the DeArman lease, mining operations could continue until all coal was mined. Under these circumstances, *594 we conclude that the royalty payment is not limited by either a dollar amount, a quantum of mineral, or a period of time. The royalties are to continue as long as North American chooses to mine coal under the terms of the DeArman lease. This fact distinguishes the instant case from the Freede case. In this case, the royalties to be paid under the agreement fail to meet all of the necessary criteria set forth in the regulations and the Freede case and, therefore, cannot be treated as production payments under section 636(a). Petitioners offered the testimony of Philip R. Bishop as to whether the interest had an expected economic life (at the time of its creation) of shorter duration than the economic life of the mineral property upon which it is a burden. Mr. Bishop testified that he was a lawyer who dealt in mineral leases, that he had observed the property covered by the DeArman lease, and in his opinion there was more recoverable coal under the property covered by the lease than was necessary to meet the minimum requirements of the amount North American was to take during the period from February 12, 1981, through February 12, 2000. We do not consider Mr. Bishop's opinion *595 to be sufficiently documented to establish this fact. However, even if this fact were established, it would not meet the standard that the interest must have an expected life of shorter duration than that of the mineral property upon which it is a burden. Nothing in the agreement prohibited North American from mining coal far in excess of the minimum quantities it was required to pay for or for a period past February 12, 2000 and North American could have mined the lease to exhaustion prior to February 12, 2000. As we read the agreement, if more coal than the minimum required to be paid for was mined, petitioners and Mr. Royall would receive royalties on all coal that was mined, and if it was to the advantage of North American to mine past February 12, 2000, it would be entitled to do so under the assignment of the DeArman lease. In our view, the agreement here involved clearly provides for royalty payments and not a carved-out production payment and the amounts received by petitioners in the two years here in issue were minimum advanced royalties. We, therefore, conclude that section 636(a) is not applicable in this case. Since we have concluded that petitioners incorrectly *596 failed to include the amount received under the agreement with North American in income as advance royalties in the years received, the next question is whether respondent properly computed petitioners' tax by considering the amounts as capital gain in accordance with the provisions of section 631(c). [3]
*597 It is not clear that petitioners contest the treatment of the payments as resulting in capital gain under section 631(c) or whether they are merely attempting to argue that the payments should not be treated even as capital gain under section 631(c) until such time as the coal is mined. Petitioners appear to argue that section 631(c) is not applicable to the advance payments they received because the statute states that "the date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined" and no coal had been mined under the agreement with North American. We consider it appropriate to state our agreement with respondent's treatment of the advance royalties received in this case. As we pointed out in Deskins v. Commissioner,87 T.C. 305, 312 (1986) and Davis v. Commissioner,74 T.C. 881, 890 (1980), affd. 746 F.2d 357 (6th Cir. 1984), amounts received as royalties under a lease granting rights to extract minerals in place are usually ordinary income. If the lessor retains an economic interest in *598 the minerals being mined, the transaction is a lease and not a sale or exchange, a prerequisite to capital gains treatment. The predecessor of section 631(c) was enacted to provide special relief to recipients of coal royalties. Under this section, a disposal of coal is treated as a sale or exchange, rather than a lease, if the lessor retains an economic interest in such coal. See the discussion in Deskins v. Commissioner,supra at 312, 313. We stated in Deskins v. Commissioner,supra at 313, "if a disposal of coal qualifies for section 631(c) treatment the date of disposal is deemed to be the date the coal is mined or the date the minimum royalty payments are received." This statement is supported by section 1.631-3(b)(1), Income Tax Regs., which states in part as follows: (1) For purposes of section 631(c) and this section, the date of disposal of the coal or iron ore shall be deemed to be the date the coal or iron ore is *599 mined. If the coal or iron ore has been held for more than 1 year (6 months for taxable years beginning before 1977; 9 months for taxable years beginning in 1977) on the date it is mined, it is immaterial that it had not been held for more than 1 year (6 months for taxable years beginning before 1977; 9 months for taxable years beginning in 1977) on the date of the contract. * * * This regulation relates to the provision in section 631(c) that the date of disposal of the coal shall be considered the date the coal is mined. As shown by the committee report with respect to the enactment of the predecessor of section 631(c), this provision of the statute relates only to determining the holding period of the coal and not to the time for inclusion of the amounts received from the deemed sale or exchange of the coal. S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 488, states with respect to the enactment of the predecessor of section 631(c) as follows: 9. Coal royalties.
Section 325 of your committee's bill, which is similar to section 307 of the House bill, provides tax relief for the recipients of coal royalties. Most leases on coal properties *600 are long-term and call for royalty payments expressed in cents per ton. Therefore, the lessor does not receive the automatic adjustment for price changes which occurs when a royalty is expressed as a percentage of the value of the mineral extracted from the property. Many of the existing coal leases are old and their royalty payments are small. * * * This section extends to the recipients of coal royalties the capital gains treatment now available to timber under section 117(k)(2) of the Code. It is intended by this provision of your committee's bill that coal royalties receive the same treatment as timber royalties. * * * Considerable uncertainty now exists as to the proper interpretation of the clause "held for more than 6 months prior to such disposal" * * *. Your committee believes that, whatever the legal technicalities may be, the lessor's holding period should run to the time the coal is mined or the timber is cut, as the case may be, and the provisions of the House bill are amended to so provide. It is clear that the regulations and our interpretation in Deskins v. Commissioner,supra, correctly reflect the intent of Congress that the phrase *601 "date of disposal shall be considered the date the coal is mined," merely extends the holding period of the coal to the date of mining if the holding period would otherwise not be sufficient to bring the royalty income received within the provisions of section 631(c). The provisions of section 1.631-3(c), Income Tax Regs., likewise make it clear that advance royalties such as are here involved are covered within the provisions of section 631(c). Section 1.631-3(c), Income Tax Regs., provides: (c) Payments received in advance of mining. (1)(i) Where the conditions of paragraph (a) of this section are met, amounts received or accrued prior to mining shall be treated under section 631(c) as received from the sale of coal or iron ore if the contract of disposal provides that such amounts are to be applied as payment for coal or iron ore subsequently mined. For example, advance royalty payments or minimum royalty payments received by an owner of coal or iron ore qualify under section 631(c) where the contract of disposal grants the lessee *602 the right to apply such royalties in payment of coal or iron ore mined at a later time. This regulation provides that advance royalties such as those involved in this case are to be taxed under the provisions of section 631(c) where there has been a disposal of coal which has been held for the period required for long-term capital gain or loss treatment. Section 1.631-3(c), Income Tax Regs., is consistent with section 631(c) and must be sustained. See Davis v. Commissioner,746 F.2d 357, 362 (6th Cir. 1984), affg. 74 T.C. 881 (1980). See also Brown v. United States,782 F.2d 559, 563 (6th Cir. 1986). The length of time petitioners held their interest in the coal here involved is not shown in the record. However, respondent determined that the advance royalties received fall within the provisions of section 631(c). This was, in effect, a determination that the holding period required by section 631(c) has been met. Respondent, having used section 631(c) in determining the deficiency, has assumed a proper holding period and petitioners have not contested such assumption other than to claim that the *603 disposal date is the date of mining. Therefore, there is no issue in the case as to whether petitioners held their interest in the coal for the period required by section 631(c). We conclude that respondent properly treated the advance royalties under section 631(c) in his notice of deficiency. Since other issues have been disposed of by agreement of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue.↩
2. Sec. 1.636-1(a)(1), Income Tax Regs., provides, in part, as follows: For purposes of subtitle A of the Internal Revenue Code of 1954, a production payment (as defined in paragraph (a) of sec. 1.636-3) to which this section applies shall be treated as a loan on the mineral property (or properties) burdened thereby and not as an economic interest in mineral in place, except to the extent that sec. 1.636-2 or paragraph (b) of this section applies. See paragraph (b) of sec. 1.611-1. A production payment carved out of mineral property which remains in the hands of the person carving out the production payment immediately after the transfer of such production payment shall be treated as a mortgage loan on the mineral property burdened thereby. A production payment created and retained upon the transfer of the mineral property burdened by such production payment shall be treated as a purchase money mortgage loan on the mineral property burdened thereby. Such production payments will be referred to hereinafter in the regulations under section 636 as carved-out production payments and retained production payments, respectively. Moreover, in the case of a transaction involving a production payment treated as a loan pursuant to this section, the production payment shall constitute an item of income (not subject to depletion), consideration for a sale or exchange, a contribution to capital, or a gift if in the transaction a debt obligation used in lieu of the production payment would constitute such an item of income, consideration, contribution to capital, or gift, as the case may be. For the definition of the term "transfer" see paragraph (c) of sec. 1.636-3. Sec. 1.636-3(a)(1) and (2), Income Tax Regs., provides that: (1) The term "production payment" means, in general, a right to a specified share of the production from mineral in place (if, as, and when produced), or the proceeds from such production. Such right must be an economic interest in such mineral in place. It may burden more than one mineral property, and the burdened mineral property need not be an operating mineral interest. Such right must have an expected economic life (at the time of its creation) of shorter duration than the economic life of one or more of the mineral properties burdened thereby. A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral property is not an economic interest in mineral in place. A production payment may be limited by a dollar amount, a quantum of mineral, or a period of time. A right to mineral in place has an economic life of shorter duration than the economic life of a mineral property burdened thereby only if such right may not reasonably be expected to extend in substantial amounts over the entire productive life of such mineral property. The term "production payment" includes payments which are commonly referred to as "in-oil payments", "gas payments", or "mineral payments". (2) A right which is in substance economically equivalent to a production payment shall be treated as a production payment for purposes of section 636 and the regulations thereunder, regardless of the language used to describe such right the method of creation of such right, or the form in which such right is cast (even though such form is that of an operating mineral interest). Whether or not a right is in substance economically equivalent to a production payment shall be determined from all the facts and circumstances. * * *↩
3. Sec. 631(c) provided in pertinent part as follows: (c) Disposal of Coal or Domestic Iron Ore With a Retained Economic Interest. -- In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 1 year before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272↩ shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. * * * The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. * * * [Emphasis added.]